H522ngo1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               16 Cr. 367 (DAB)

ANDRE MARIE NGONO,
a/k/a "Luc O. Ndi,"
a/k/a "Luc Owono Ndi,"
a/k/a "Luc Ndi,"

                    Defendant.

------------------------------x
                                             May 2, 2017
                                             9:05 a.m.

Before:

                    HON. DEBORAH A. BATTS,

                                             District Judge
                                                and a Jury


                         APPEARANCES

JOON H. KIM
      Acting United States Attorney for the
      Southern District of New York
BY:   TIMOTHY T. HOWARD
      MICHAEL LONGYEAR
      Assistant United States Attorneys


ANDRÉ MARIE NGONO,
      Pro Se Defendant

EZRA SPILKE
      Standby Counsel for Defendant


ALSO PRESENT:

JENNY SATINOVER, Paralegal Specialist, U.S. Attorney's Office

CONOR O'SULLIVAN, Special Agent, F.B.I.

H522ngo1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Good morning.  Please be seated. |
| 3 | MR. LONGYEAR:  Your Honor -- I'm sorry. |
| 4 | (Pause) |
| 5 | THE COURT:  Good morning.  Mr. Longyear. |
| 6 | MR. LONGYEAR:  Good morning, your Honor. |
| 7 | THE COURT:  You wanted to report that you were handing |
| 8 | certain things up to the court? |
| 9 | MR. LONGYEAR:  Yes, your Honor. |
| 10 | THE COURT:  Please do. |
| 11 | MR. LONGYEAR:  Your Honor, I handed up to |
| 12 | Ms. Humpreville two copies of the letter that we filed via ECF |
| 13 | last night in response to your Honor's inquiries at the end of |
| 14 | the day yesterday, as well as a proposed verdict form, as well |
| 15 | as a proposed -- proposed redactions to the indictment that |
| 16 | your Honor had requested yesterday.  The words that are |
| 17 | highlighted are the words that the government would propose |
| 18 | redacting. |
| 19 | THE COURT:  I will then on my next version of the |
| 20 | draft synchronize those with what I put in the charge. |
| 21 | Ms. Humpreville gave Mr. Ngono a copy of the charge |
| 22 | that was sent last night.  I know that he has not had an |
| 23 | opportunity to review it, but we will certainly give him an |
| 24 | opportunity to review it before we have the charge conference. |
| 25 | I know, Mr. Ngono, you cannot give me an actual |

1    estimate of how much time you think you will have left on your

2    direct examination, and then we have the government's

3    cross-examination, then you may have redirect.

4         After that, I assume that you will rest and then the

5    government, if it wishes, will have an opportunity to put on a

6    rebuttal case.

7         Then after that and they rest, then I guess we can

8    move on to letting the jury go and then give Mr. Ngono a chance

9    to read the draft, current draft of the jury charge, and then

10   we will see where we are in the day and whether or not we can

11   start or have our charging conference.

12        Is there anything else that we need to deal with right

13   now?  I told the jury to be here at 9:30.

14             MR. NGONO:  Yes, your Honor.

15             THE COURT:  Mr. Ngono.

16             MR. NGONO:  Yeah.  There is an issue that came to my

17   mind yesterday about the witness that the prosecution will call

18   from the chart that she made, there is an issue with the chart.

19             THE COURT:  Yes.

20             MR. NGONO:  The two documents I would enter as

21   evidence and that duplicated, and the intention behind it is

22   not known to me, but what I see is the first document, the

23   first chart, was a summary of the amount lost, and the witness

24   testified on that amount, and that amount was 84,000

25   six-something.  But then when the witness was called back

H522ngo1

1     again, the witness came back with another document, and I'm not

2     sure what was that document for.

3               THE COURT:  You mean it was on the disk?

4               MR. NGONO:  No, the government entered that chart

5     again as evidence after the witness has already testified on

6     the total amount that was 84 dollars.  And then the witness was

7     called for the next time and the witness testified that the

8     chart was 57 -- 57 -- 57,700 based on the information that I

9     gave to the government when we were at the sidebar.

10              So, to me, this was a manufacture of the first

11    document that was testified by the witness.

12              THE COURT:  I'm not sure that I understand what you

13    are saying.  The witness was recalled to put in the underlying

14    documents that supported the chart that was already in evidence

15    in the event that the jury wanted to see the individual

16    documents that there was a basis for that.  There was nothing

17    added to that.  I'm not sure what you are talking about.

18              MR. NGONO:  Yes, your Honor, something was added.  The

19    first document --

20              THE COURT:  Added to what?

21              MR. NGONO:  To the second document that was

22    introduced.  The first document was $84 -- 84,000 dollars and

23    600, I believe.

24              THE COURT:  Let's talk about the actual exhibit

25    numbers.  What is the first one?  What is the second one?

H522ngo1

1                MR. NGONO:  Yes, your Honor.

2                MR. LONGYEAR:  Your Honor, 214, Government Exhibit 214

3     is the summary chart, and Government Exhibit 214B is the disk.

4                THE COURT:  Looking at Government Exhibit 214, what

5     are you saying was changed?

6                MR. NGONO:  On 214 on the last row, the total amount

7     disbursed is $84,256.

8                THE COURT:  What page are you on, and it's Government

9     Exhibit 214?

10               MR. NGONO:  And then the next --

11               THE COURT:  I said what page are you on?

12               MR. NGONO:  214, your Honor.

13               THE COURT:  What page of that exhibit?

14               MR. NGONO:  Oh, first page.

15               THE COURT:  And what column are you talking about?

16               MR. NGONO:  The second column on the last row, where

17     it said "total disbursed" is $84,286.

18               Now, the next document -- what is the number?

19               (Pause)

20               (Parties confer)

21               MR. NGONO:  Your Honor, I don't have the printout of

22     the one that the witness testified yesterday.

23               MR. LONGYEAR:  Your Honor, Ms. Humpreville has a copy.

24               (Pause)

25               MR. NGONO:  Yes, your Honor, 214B.

H522ngo1

1          THE COURT:  Which is now printed out.

2          MR. NGONO:  Yes, your Honor.

3          THE COURT:  This is 214B?

4          MR. NGONO:  Yeah.  It's not B, but it's second page --

5          MR. LONGYEAR:  Your Honor, for the record, what we had

6    done is we printed out all the files that were contained on the

7    disk for review just because Mr. Ngono obviously doesn't have a

8    computer, so we wanted to do it --

9          THE COURT:  Fine.  Okay.  Thank you.

10         Mr. Ngono, what is the question?  You said on page 2.

11         MR. NGONO:  Yeah, on page 2, we see the amount that

12   now appear is no longer the amount that the witness testified.

13   Instead of 84,256, it was redacted to -- they redacted it to --

14   I think -- I'm sorry, your Honor, this is not the page.

15         (Pause)

16         MR. LONGYEAR:  Your Honor, I may have an idea of what

17   the issue could be.

18         THE COURT:  Let me just ask Mr. Ngono to talk with

19   Mr. Spilke, because maybe Mr. Spilke can help him find what it

20   is that is the problem.

21         (Mr. Ngono and Mr. Spilke confer)

22         (Parties confer)

23         MR. NGONO:  Thank you, your Honor.  The amount -- they

24   agree that the amount would be the same as on the record chart.

25         THE COURT:  So that there is no problem.

H522ngo1

1                MR. NGONO:  No problem, your Honor.

2                THE COURT:  Okay.  Thank you.

3                Anything else that we need to address at this point?

4                I would like to have Mr. Ngono and Mr. Spilke sort of

5      talk over things before we bring the jury out.  And before we

6      bring the jury out, Mr. Ngono will be up here and accompanied

7      by the marshal.  All right?

8                MR. LONGYEAR:  Your Honor, one more issue.  We have

9      the wallet that was on Mr. Ngono when he was arrested.  This

10     came up yesterday.  I don't know how your Honor would want to

11     proceed.  We can give it to Mr. Ngono.  I think his intent was

12     to introduce some of the cards that were also in the wallet

13     that the government did not introduce in its direct case.

14               THE COURT:  Do you have a problem handing that over to

15     him?

16               MR. LONGYEAR:  I don't, I just want to --

17               THE COURT:  Yes, that's good.  Please hand it over.

18               (Pause)

19               THE COURT:  I have had a chance to review the letter

20     brief sent to me by the government last evening, and it looks

21     like what I had thought was necessary in terms of

22     distinguishing among the means is not.  The government has

23     shown that, even though I would like the jury to say the

24     amount, that that is not necessary, and so I can't ask for more

25     than is necessary, so that the element of amount will just say

H522ngo1

1    more than $1,000, more than $200.  So there are obvious

2    adjustments that I will be making to the charge based on the

3    information I receive from the government.

4            However, I am not going to make them now, because then

5    I would have to give out another version of the charge; and so

6    we will just incorporate everything on one document, including

7    what happens and what's determined during the charging

8    conference, and then I will need to have time to have that

9    inputted and then reviewed by me, so it's not clear exactly

10   when I will be bringing the jury back for the summations and

11   the charge, whether it will be sometime in the afternoon

12   tomorrow or maybe in the morning, depending on how far we get

13   today.  So everything is in flux, but, obviously, before we let

14   the jury go today, I do have to tell them what time to be in

15   tomorrow.  All right?

16           MR. LONGYEAR:  Thank you, your Honor.

17           (Recess)

18           (Jury not present)

19           THE COURT:  Are we ready for the jury?

20           MR. SPILKE:  Yes.

21           MR. LONGYEAR:  Yes, Judge.

22           (Continued on next page)

23

24

25

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.

3    Please be seated.

4              JURORS:  Good morning.

5              THE COURT:  Mr. Spilke.

6              MR. SPILKE:  Thank you, Judge.

7     ANDRÉ MARIE NGONO, resumed.

8    DIRECT EXAMINATION

9    QUESTIONS FROM MR. NGONO BY MR. SPILKE:

10   Q.   Yesterday you testified that you WORKED for Luckendy Realty

11   as a security guard?

12   A.   Doorman, security guard.

13   Q.   When was that?

14   A.   Starting 2007.  Around March, April, end of March,

15   beginning April.

16   Q.   And were you still working there in 2008?

17   A.   August 2008 was the date I left.

18              THE COURT:  I'm sorry I didn't --

19              THE WITNESS:  August.

20              THE COURT:  You worked there until August.

21              THE WITNESS:  2008, yes, your Honor.

22   QUESTIONS FROM MR. NGONO BY MR. SPILKE:

23   Q.   What was the address of that business?

24   A.   Pentagon was located in Brooklyn, but where I worked was a

25   client.  So Pentagon was providing services to other building,

1   and Luckendy was providing services to Pentagon.

2   Q.  Do you know the address of Luckendy Realty?

3   A.  Where I work -- Luckendy was in Connecticut, but I work for

4   them in New York.

5           MR. SPILKE:  Ms. Satinover, would you put up Defense

6   Exhibit B2 already in evidence, the top quarter of the page.

7   QUESTIONS FROM MR. NGONO BY MR. SPILKE:

8   Q.  Showing you Defense Exhibit B2, is this the bank statement

9   for the company that you worked for?

10  A.  Yes.  This is Luckendy Realty that I worked, they were

11  using before; and, as we can see on the right corner, the date

12  is August 26, 2007.

13          MR. SPILKE:  Thank you, Ms. Satinover.  You can take

14  the exhibit down.

15  QUESTIONS FROM MR. NGONO BY MR. SPILKE:

16  Q.  When did you start working for Pentagon?

17  A.  Basically when I was brought to construction in Manhattan

18  to be fingerprinted for background check.  That was April 4,

19  2007.  And I was kept at that construction Web site -- work

20  site for preassignment.  And on 11, I was placed on a building

21  in Harlem.  That building address is 2002 in Fifth Avenue, New

22  York, New York.

23  Q.  In the course of working for Pentagon, were you assigned to

24  different businesses?

25  A.  No.  I worked for that 2002 building 2002 in Fifth Avenue

h522ngo1                          Ngono - Direct

1    from April 11 to August -- may you put the stipulation up, the

2    stipulation?

3              MR. SPILKE:  Ms. Satinover, would you put up Defense

4    Exhibit H, the top half of the page, please.  Thank you.

5    QUESTIONS FROM MR. NGONO BY MR. SPILKE:

6    Q.  Are these businesses that you -- showing you page 4 of

7    Defense Exhibit H, are these businesses that you worked for?

8    A.  Yes.  The very last one, Pentagon Protection and

9    Investigation, Inc., so after my preassignment, I was -- I

10   started on April 11, 2007, and I was asked to leave on August

11   8, 2008, which is more than a year.  And while I was working at

12   this Pentagon, when I was with Pastor Sam, when I would work

13   off the book, Pentagon was actually paying Luckendy

14   organization by check, and those check was received by Luckendy

15   organization and deposited in a bank account.

16   Q.  Did you receive training --

17   A.  Yes.

18   Q.  -- when you worked for Pentagon?

19   A.  Yes, I did.

20             MR. SPILKE:  Ms. Satinover, would you put up page 15

21   of the same exhibit?

22   Q.  What does this page show?

23   A.  So basically what it shows, my preassignment, when I went

24   to put in on the construction work site, on April 4, 2007, that

25   was my preassignment until they can find, they place me to 2002

1    and Fifth Avenue.  Then I was already on the job, was on the

2    job on September 29, 2007.  That is the 29th, I was already

3    working, on September, it would be five to six months later.

4            And we also see how my end work happened on May 12,

5    2008, meaning I was already on the job for one year, the

6    annual.

7            At the very bottom, we also see on the job, but that

8    on the job that was not me.  I was not in America on May 15,

9    2006, meaning somebody else was being used to work there, but

10   it came under my name.  Because I only came to America December

11   7, 2006.  That could not have been me.

12   Q.  But the other trainings you did receive?

13   A.  Yes, that what I received in Brooklyn and on-the-job

14   training, on-the-job training, I received that, and the annual

15   I also received that.  That was me.  But the last one, that was

16   not me.

17   Q.  And at some point, a license was issued, right?

18   A.  I was not aware that a license was issued.

19           MR. SPILKE:  Ms. Satinover, would you put up page 13,

20   please.

21   QUESTIONS FROM MR. NGONO BY MR. SPILKE:

22   Q.  This is page 13 of Exhibit H.  What does this show?

23   A.  Yeah, basically what it says, that a license was issued on

24   July 27, 2007, and was to expire on -- at the very bottom, was

25   to expire on July 26, 2009.  And the letter were printed on

1   August 17, 2007, and the badge was printed from the DMV on --

2   on March 13, 2008.

3           But what I did, my only duty is not about paperwork.

4   My duty is just show up and work.  They were in charge with

5   document, application, and all of that.  My contract was simply

6   to work for them.

7   Q.  Just so we are clear, what kind of license was this?

8   A.  This is a security/doorman license.

9   Q.  Issued by who?

10  A.  The Department of Licensing, New York State Department of

11  licensing.

12          MR. SPILKE:  Ms. Satinover, can we put up page 12 of

13  the same exhibit.

14  QUESTIONS FROM MR. NGONO BY MR. SPILKE:

15  Q.  What does this page show?

16  A.  This page shows the addresses that corresponded to the

17  licensing, the license that was issued.  And for the last part

18  still show that the license was connected to the address where

19  I live in March when I was kicked out of Pastor Sam's property.

20  March 2008, I was no longer there.  I left in 2007.

21          And this date also show, this date is also, to me,

22  look like it is the date when the license was printed by the

23  DMV and I was never informed that it was mailed to that

24  address, and I was no longer there.  And Luc and Contact 1,

25  they were there in connection with Pastor Sam.

h522ngo1                          Ngono - Direct

1   Q.  Just so we are clear, which address -- there are two

2   addresses on the screen.  Which address are you speaking of?

3   A.  The one in 2008, because I started working with Pentagon

4   Protection in 2007.

5   Q.  What address is that?

6   A.  The address on the bottom, 385 East 152nd Street, Bronx,

7   New York, and zip code 10455.

8         And the top address is where, when I was kicked out of

9   the basement, this is where they put me with my daughter to

10  live, and this is where I was also living when I was going to

11  working -- this is also in Harlem, the Harlem 140th Street.

12  And 2002 in Fifth Avenue is by 125th Street around -- it's on

13  Fifth Avenue, but it's around 125th Street, yes.

14  Q.  You received payment for your services at --

15  A.  I did not receive payment.  I was working for them.  I have

16  a contract to work for them for five years before I become -- I

17  have my freedom.

18        But the service that I was providing were paid by

19  Pentagon to Luckendy Realty, and they received the checks, just

20  like they did with Pastor Sam.

21        THE COURT:  Mr. Ngono, are you saying that you did not

22  get paid money?

23        THE WITNESS:  No, your Honor.  It was part of the

24  contract.

25        THE COURT:  What do you mean by it was part of the

h522ngo1                         Ngono - Direct

1    contract?

2               THE WITNESS:  I would live rent-free, they give us

3    food, and we were to work for them for five years.

4               THE COURT:  But you got no pay for your work.

5               THE WITNESS:  No pay for the work.  Part of the trip

6    to work here for them, and basically their calculation is that

7    for five years, you work -- you will return $50,000.  $50,000,

8    from where I came from in Cameroon, is 30 million, and this is

9    a lot of money.

10              But it turns out that I produce more than they

11   actually they were expecting based on how they exploited me.

12              MR. SPILKE:  Can you put up page 4, Ms. Satinover.

13   Thank you.

14   QUESTIONS FROM MR. NGONO BY MR. SPILKE:

15   Q.   Showing you again page 4, there are two businesses called

16   Metro One.  Did you work for those companies?

17   A.   From the bottom -- starting from the bottom, that company,

18   St. Moritz Security Services.  So I was removed, I was removed

19   from Pentagon, because they wanted to make more money.

20   Pentagon was paying them 8 point -- $8.50 per hour.  As they

21   were looking where to place me, they went with St. Moritz,

22   which provide services to very high-end store in Manhattan,

23   that include Burberry, Hermès, Gucci, all that.  I work in all

24   those stores.  So that is when they took me to St. Moritz, and

25   St. Moritz pay rate was actually $15 an hour, but St. Moritz

h522ngo1                          Ngono - Direct

1    got a bargain with them, and they were paying them $11, which

2    is far better than the 8.50 they were making with Pentagon.

3          Now, they added me to the Pentagon.  In this Pentagon,

4    I was doorman.  So I have all the connection with all the

5    people living in the building.  I was literally like the man to

6    go to.  When they have a problem, they go to me.  When I told

7    them that I would have to leave, they contacted Pentagon that I

8    cannot leave, because they have a board of director, his name

9    was Mr. Barry.  He personally called Pentagon, Mr. Brennan in

10   Pentagon, not to remove me.  But Mr. Luc Ndi and Contact 1,

11   they say I would have to go because I work for them and I go

12   where they ask me to go.

13         This is what I told Mr. Barry, and I went -- I have

14   little age children in the house, they were crying.  I even

15   have one who draw a goodbye sign and said, We will miss you.

16   And another little girl, she said bye-bye and gave me a blue

17   card, and I have kept this blue card until today.  But I had no

18   choice then to leave that building.

19         So I went to St. Moritz, which is located at 100 --

20   they are located in Pennsylvania, actually.  So they have an

21   office here on 137th Street in Manhattan.  So what they do they

22   have contract with all the high-end store, and then they need

23   doorman.

24         So what we do, we literally stand at the door.  When a

25   customer come, we open the door.  We are the one opening the

1    door to the customer, greeting them with a smile, making sure

2    that when they leave, they have no complaint about the store.

3    If they complain, you will no longer work there.

4                 So this is how I was working at St. Moritz from July

5    7, 2008, until June 16, 2010.

6                 Now, again, was $11.  They want to make more money.

7    Even though I lost my job, I was no longer in the 2000, in the

8    building, I actually started liking the high-end store, because

9    those are very well-to-do people, very civilized.  You would

10   never have a problem.  Everything is very quiet.  You just say

11   good morning, goodbye, smile.  It was the perfect world, very

12   civilized.

13                So, they wanted to make money.  That's why they move

14   me.  They place me at Elite Investigation.  Over there, they

15   were making $13 for my services.  And with Elite, I was placed

16   on the building just right in front of Chrysler building.

17   That's where I was working.

18                And what I am saying, at Elite, this position,

19   doorman, it has like ID checks, like we have downstairs before

20   people enter the building, they have to present a license, they

21   have to register to a system.  So I was dealing with a lot of

22   identities.

23                So after Elite lost the contract, lost the contract

24   with that building, because the building went -- it was run by

25   a German, and the building went -- had a problem, financial

h522ngo1                          Ngono - Direct

1    problem, so the real estate office, BICC was the real estate

2    managing the building, so they lost the contract because Pfizer

3    was renting the building, moved out for some reason, because

4    that building is a mess.  It may look beautiful outside, but in

5    there, in the conference room, work every day you have to clean

6    it.  So people started moving out.  That's when they lost the

7    contract, and they couldn't afford to pay the guard $13 an

8    hour.

9           This is when they moved me to Metro One Loss

10   Prevention.  And all these application are completed by them.

11   Everything is done online.  I am just to work two more years.

12   I go, I am waiting for my date.  My date was December 8, 2011.

13   That was the date I was to be in charge of myself.  My only

14   worry here was my daughter.  I signed on for five years.  I

15   didn't want to have any problem with them because if I have

16   problem with them, the person who might suffer was going to be

17   my daughter.  So I was trying to be as quiet as I could.

18          So when they moved me to Metro One Loss Prevention,

19   which is Staten Island, I never been to Staten Island.

20   Everything is done online.  All I have to do, you know, Go

21   here.  This is where you are going to work.  I just have to

22   show up, and this is how I do it.

23          And this is also because me, coming from Africa, we

24   don't have all these thing with job application, with Social

25   Security, with everything.  In Africa, when you want to work,

1    you just show up, say, Are you hiring?  Yes.  You can work?

2    Yes.  Go to work.  And you get paid every 30 days.  I didn't

3    even know that people get paid per week.  We get paid every 30

4    days, every month in Africa.  To me, this was new, seeing

5    checks here and there, but the money wasn't mine.  So I kept

6    working.

7            Now, when they moved me to Metro One Loss Prevention,

8    I was working Metro One.  They also have contract with more

9    store.  My first store with Loss Prevention was a store that is

10   now closed.  It was called Daffy's.  That store was close to

11   Macy.  I was in charge of the leather section.  That's where I

12   was working.  So Daffy's had a problem, started laying out,

13   started laying out people.

14           So they transfer me in other stores, DSW, and I was

15   going to store to store, until I ended up to what is the store,

16   Talbot.  Talbot is a lady's store on Broadway, 180 -- no, 182nd

17   Street, so I was working there.  They, for some reason, they

18   told my people that they didn't have a work.  At that time, you

19   can see, that time is 10 -- October 12, 2010.  I worked there

20   to February 4, 2011.

21           Now already 2011, so my day is coming up, because I am

22   almost close there on February, so I was to be on my own on

23   December 8, 2011.

24   Q.  When you say your date is coming up, what do you mean?

25   A.  My date I was to work for them for five years from the date

1    I started.

2    Q.  And when you say "them," who are you referring to?

3    A.  I am referring to the enterprise that brought me here and

4    they have people that were presented here, which is Contact 1

5    and Luc Owono was a part of the one in here.  He work.

6            So there is a gap as from February 2004 to when I went

7    back again.  I didn't get fired.  They just say for that time

8    they didn't want me.  This is when they place me to U.S.A.

9    Security.  That U.S.A. Security is not here because U.S.A.

10   Security provided services to K-Mart.  They are the one wearing

11   the white shirt, K-Mart on the 200 34th Street Penn Station.

12   So that gap is I was not working.  That gap is I was actually

13   at K-Mart.  I don't know what arrangement was there, but I was

14   in there, I was sent there to K-Mart to work for Luckendy

15   Realty, but for K-Mart under U.S.A. Security.

16   Q.  And then you worked at Metro One again?

17   A.  Then, at this point, as I was working -- as I was working

18   at K-Mart, as it goes up and down, I don't know what happened.

19   They told me, oh, you know what, because Metro One wanted you

20   to go back for some reason.  Metro One wanted them to send me

21   back with them, because they had an opening at Barnes & Noble.

22           And Barnes & Noble was also close to Talbot where I

23   used to work.  Since I knew the place really well, so they --

24   the guard that they find that can actually get there on time

25   was me, because I was -- this is on Broadway and 82nd Street.

1   Talbot store is right there and Barnes & Noble is just at the

2   bottom, like the same block.

3           So I never had a problem running late, so they say I

4   was the best fit for that where they want me.  So they send me

5   back.  They send me back to Metro One Loss Prevention.  I never

6   been to Metro One.  I was working for them.  I never even went

7   to Staten Island.  They just tell my people, and my people send

8   me here.  I don't know who they are.

9           So that's when I went back to Barnes & Noble.  But

10  before I went back to Barnes & Noble, because we already June

11  remember, I'm about to leave December.

12          This is when -- in between from I got married between

13  2010 and 2011.  They help me get married, because they sign --

14  they gave asset to the company online, so I can communicate

15  with a lady.  This is how I met my ex-wife.

16          So when I met her, I literally told her, You know

17  what?  I want to get married.  She said, Okay.  I want to get

18  married, too.  So what do we do?  She say, I come to New York.

19  I say, Fine.

20          And I told them, like, Oh, I'm not sure if this lady

21  just joking, but she says she want to come to New York and get

22  married.  They said, Wow, we going to give you the money,

23  because I didn't have the money.  So they sent her the money to

24  come to New York, but I never told her that.

25          She came to New York.  First I thought, maybe this one

h522ngo1                          Ngono - Direct

1    of these crazy woman.  I told her I have a daughter.  I didn't

2    know what was her intention.  Is she come here to kill me or

3    kill my daughter?

4             MR. LONGYEAR:  Objection, your Honor.

5             THE COURT:  Yes, that testimony, "I don't know what

6    her intention was," is right.  He doesn't.  And, therefore,

7    when he is giving speculative reasons of what her intentions

8    might be, that is inadmissible.  I am striking that.  You are

9    to disregard it.

10   A.  So she came in and --

11   Q.  So you were just describing how your ex-wife came to New

12   York?

13   A.  Yes.

14   Q.  Do you want to explain how that happened?

15   A.  We met online, and she came to New York.  And her ticket,

16   her train ticket was paid by the Luckendy organization.

17            When she arrived, I was living at that time at 6687

18   Forest Avenue in Ridgewood.  And that was also rented by -- it

19   was -- it was a three-level building.  They rented the whole

20   building.  And what they did, they cut from the first, from the

21   basement to the top floor, they cut in very small, small, small

22   rooms.  That's where we lived.  That's where they was renting

23   it, so they was renting it to whoever wanted to rent, and they

24   were also putting the people that they used to work for them.

25            And in that house at 6687 Forest Avenue, the person

h522ngo1                          Ngono - Direct

1   who came in before me, Ngono André, using the same passport, he

2   was already out of the servitude because he came in 2000.  He

3   did six years.  But, unfortunately for him, he didn't get a way

4   out.  He couldn't like fix himself.  So he was still depending

5   on them.  And he was living with us, and he was my roommate.

6   When I came in, he was illegal.  So his visa that he came in

7   2000 was expired, and he didn't know what to do.  That's when

8   he said he want to study computer science.

9          Because I came with the same visa -- not the same

10  visa, I came with the same passport, and my visa was still

11  valid, he registered to Micropower for computer, basic computer

12  science, and he basically was trying to update his status based

13  on the new visa that came in.  Because his first visa, he

14  couldn't use his first visa.  It was only valid for 12 month,

15  and it expire when he was still working for them.

16         THE COURT:  I'm not sure that I quite get that.  Would

17  you please -- we left your wife arriving.  You have a roommate.

18  And the roommate you say was the person who used --

19         THE WITNESS:  The first person who came under Ngono

20  André Marie, who came in with the same passport, but with a

21  visa that was valid for 12 month was why he came in.  That visa

22  expired.

23         He was technically supposed to get married, but he

24  didn't.  He couldn't.  For some reason he couldn't meet someone

25  to marry.

1              So when his five years were over, so he was illegal.

2    He didn't have money.  So he technically depend on them.

3              But when I came in in 2006, I came in with the same

4    passport.  His visa was still in that same passport, but he

5    couldn't use it.  But the visa that they brought me in was

6    still valid.

7              So he needed at some point to have a status, so he

8    decided to update that visa as a student.  That was 2007.

9    A.  Can you put that up again?

10   Q.  Sorry?

11   A.  Can you put that visa up, student visa application?

12   Q.  Well, why don't we come back to that.

13   A.  All right.

14   Q.  Let's go back to Exhibit H.

15             At some point did you leave Metro One?

16   A.  Yes.

17   Q.  When was that?

18   A.  Before I got -- they helped me get married.  As I was

19   preparing to -- I didn't even know what I was going to do, my

20   time was coming up, and when I got married, at some point my

21   wife had and emergency.  My wife had a family situation in

22   Utah, so she wanted us to move back there.  Why?  Because her

23   previous marriage, she had two children, and I have a daughter.

24   So she --

25             THE COURT:  Excuse me come up here.
                   (Continued on next page)

h522ngo1                          Ngono - Direct

1              (At the sidebar)

2              THE COURT:  Mr. Ngono, you had your ex-wife on

3    cross-examination, and you did not ask her any of these things.

4    You are now giving information that she could have

5    corroborated, if it's true.  But why didn't you ask her, when

6    you had her on cross, about some of these things that you are

7    telling us now?

8              THE WITNESS:  She already gave the testimony to the

9    F.B.I., and they have --

10             THE COURT:  Slow down.  Say it again.

11             MR. NGONO:  They had it on the 300 material, so she

12   gave that interview already to the F.B.I.

13             THE COURT:  So you are saying she told them.

14             MR. NGONO:  Yeah.  They had it on 300 material with

15   the interview.

16             THE COURT:  Yes, but what I am -- so you knew about it

17   but you didn't ask her about it?

18             MR. NGONO:  It wasn't important.  I am just going --

19             THE COURT:  Well, if it's not important, then let's

20   not talk about it now.

21             MR. NGONO:  All right.

22             THE COURT:  Okay?

23             MR. NGONO:  All right.

24             (Continued on next page)

25

```
 1              (In open court)

 2              MR. SPILKE:  May I confer for just a moment.

 3              (Mr. Spilke and Mr. Ngono confer)

 4     QUESTIONS FROM MR. NGONO BY MR. SPILKE:

 5     Q.  We were talking about your leaving Metro One Loss

 6     Prevention.  When did that happen?

 7     A.  September 9, 2011.

 8     Q.  Would you like to tell us the circumstances surrounding

 9     your leaving Metro One?

10     A.  Yes.  So basically we were -- I was working at Metro One as

11     usual.  And the manager of the store, they gave us the

12     instruction, at the closing time, you have to make sure all of

13     the customer -- they have -- at the closing, when the store

14     closed, 15 minute before the store closes, we have to go around

15     and take all the customer to make sure they get ready to leave

16     to cash register.

17              Now, five minutes, we go back and tell them that the

18     store will close in five minutes, now they might have to leave

19     the store because we are going to close the door.

20              At that time, at that time, we sweep the floor.  So we

21     start from the bottom kind of, like, telling the customer,

22     like, now it's time you have to go, we are sorry, but we have

23     to close at the regular time.  So we kind of push them out

24     because --

25     Q.  Let me interrupt you there for a moment.
```

1          When you say sweep the floor, do you mean literally

2    with a broom, sweep?

3    A.   Sweep the floor mean, we literally go to -- at the end,

4    from like the end of the store, I step in the middle, the

5    manager of the store stay on the left, and there NYPD that come

6    to work with us, because it is always crowded.  Some -- in New

7    York, with the store, so many people specialize to sue those

8    stores.  So that's how Barnes & Noble have solve this problem.

9    So they will have the police officer closing the store with us.

10   So when we --

11         THE COURT:  What do you mean by sweeping the floor?

12         THE WITNESS:  Sweeping, we stand one, two, three and

13   we walk, sweeping, meaning we kind of getting everybody out.

14         THE COURT:  In other words, it's not cleaning the

15   store.

16         THE WITNESS:  Not cleaning.  That's the language we

17   use, "sweep the floor," meaning we get everybody out as we

18   move, nothing left behind.  That's why we call it sweep the

19   floor.

20         THE COURT:  Okay.

21   A.   So we were sweeping the floor.  I was in the middle.  The

22   manager was on the left, and NYPD was on the right.  But on the

23   middle, they happen to have customer that was still reading

24   books.  It was already two minute left.  And that was at the

25   top floor.  So I went past by, and I told him, Okay, we are

h522ngo1                          Ngono - Direct

1    closing.  You may want to go downstairs, and leave downstairs.

2    Because on the top floor, we don't want people to stay there.

3    And he said, Yeah, yeah.  Let me just read this book.  I'm just

4    trying to see if I can buy it.  So I left him alone.

5              So we went down on the mezzanine.  So on the

6    mezzanine, we swept the mezzanine.

7              MR. LONGYEAR:  Your Honor, can we have just a brief

8    moment?

9              THE COURT:  Yes.  Come up.

10             MR. LONGYEAR:  Thank you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

h522ngo1                         Ngono - Direct

1                  (At the sidebar)

2                  MR. LONGYEAR:  Thank you, your Honor.

3                  I understand that this is Mr. Ngono's testimony.  I am

4        just failing to see the relevance of some of these segues into

5        work histories and anecdotes about what happened on this job.

6                  THE COURT:  I understand what you are saying; but, in

7        a way, the detail may support that what he is saying is

8        accurate, number one.  Number two, I understand that some of

9        these are detours, but the detour then leads into something

10       else that might be relevant.

11                 MR. LONGYEAR:  Okay.

12                 THE COURT:  And because I don't know what's coming

13       out, I am loathe to say anything until something has been said

14       which is inappropriate, and then I strike it.

15                 MR. LONGYEAR:  Understood, your Honor.

16                 THE COURT:  Okay.

17                 MR. LONGYEAR:  Thank you, your Honor.

18                 (Continued on next page)

19

20

21

22

23

24

25

h522ngo1                          Ngono - Direct

1            (In open court)

2    BY MR. SPILKE:

3    Q.  We left off when you were describing an instance in which

4    you were clearing the store.  Would you please continue?

5    A.  Yes.  So basically Barnes & Noble was closing at 10:00, so

6    it was already 9:58.  So I left that customer.  It was only one

7    customer.  And because he was on the middle aisle, so it was my

8    responsibility to get him downstairs.  So I left him.  Actually

9    I stayed there, just to tell him, I cannot move past you, but I

10   said, I am coming back.  Make sure you make your choice, you

11   get the book that you need.  In two minute the store will

12   literally close.

13           So I went to the cafeteria in Barnes & Noble on the

14   second floor, it's like the mezzanine.  So I swept the

15   cafeteria, and then the manager and the police officer went to

16   the first floor.

17           Now, I went back upstairs, and it was already 10:00.

18   Now the gate is going down.  And I tell the customer, Now we

19   are officially closed.  May you leave the store.  He said, No,

20   he is a customer, and he will not leave the store.  Then I tell

21   him, sir, This is my job.  My job is just to tell you that you

22   have to leave the store when the store closes.  This customer

23   became angry.  He said he wants to see the manager and he need

24   me out of here or he will sue Barnes & Noble for threatening a

25   customer.  So the police officer called the manager, because he

1   was really going wild.  The police calmed him down, the manager

2   was called.  The manager told me, okay, I will take care of it

3   just leave him.  You will go downstairs.

4        I went downstairs, as I was instructed.  He through

5   ten more minutes, and I was ready to go, because they don't pay

6   hourly.  So I have turn my back to leave the store.  I was

7   asked by the manager not to leave until that customer leave the

8   store, and he have to place a complaint with the manager as I

9   was being rude to him.

10        At that point, when he left the store, the manager

11  started yelling at me, like, You will never, ever talk to the

12  customer like that again.  And I said, This is what you ask us

13  to do, to ask the person to leave the store.  What did I do?

14  He said, I don't care what you did, but the customer is mad.

15  He doesn't want you to leave the store.  And that's when I say

16  all right, I am a doorman, but I am not a doormat.  Goodbye.

17  So I left the store.  And immediately they call, May 20, they

18  call Metro One, and Metro One call Luc Ndi Owono.

19        MR. LONGYEAR:  Objection, your Honor.

20        THE COURT:  Yes.

21  A.  This is when --

22        THE COURT:  No, no, no.

23        Were you there when they called?

24        THE WITNESS:  They informed me that I was fired,

25  because they the one inform me, this is how the employment

h522ngo1                     Ngono – Direct

1   benefit come in.  That's the claim of Count Two.  This is what

2   I am going to, employment benefit that were claimed was based

3   on when I was relieved in Barnes & Noble.  It is the Count Two

4   on the indictment.

5            MR. LONGYEAR:  Objection, your Honor.

6            MR. SPILKE:  Let me ask --

7            THE COURT:  Yes.

8            MR. LONGYEAR:  Your Honor, may we approach?

9            THE COURT:  You may.

10           MR. LONGYEAR:  Thank you.

11           (Continued on next page)

1          (At the sidebar).

2          THE COURT:  Mr. Longyear.

3          MR. LONGYEAR:  Your Honor, that last statement just

4     misstates the record, and it misstates what is underlying the

5     employment claim.  The first claim, as we saw from the

6     Department of Labor claims, was in February of 2011.  It was

7     not based on his being fired from Metro One.  That comes later.

8     The second unemployment claim, and there are issues within the

9     unemployment dispute, but the initial claim came, it's my

10    understanding, after he was fired or terminated from K-Mart.

11    This completely misstates.

12         THE COURT:  You know what?  You are really going to

13    point that out on cross-examination.

14         MR. LONGYEAR:  All right, but I just --

15         THE COURT:  Thank you.  I know.

16         MR. HOWARD:  I think there is also an issue of

17    discussing the law and the counts in the course of his

18    testimony.

19         THE COURT:  Yes.  Do not mention the counts.  Do not

20    mention what you are charged with.  That is what is known as

21    the law.  You don't talk about the law.

22         MR. NGONO:  Yes, your Honor.

23         THE COURT:  I do.

24         MR. NGONO:  Yes, your Honor.

25         THE COURT:  You do it again, I'm going to strike it

1    and I may even cut off your testimony.  So be very careful that

2    you don't cross that line again.

3              MR. NGONO:  All right, your Honor.

4              (Continued on next page)

1              (In open court)

2              THE COURT:  Ladies and gentlemen, I am striking from

3    the record, and you are to disregard, Mr. Ngono's talking about

4    the counts and what he is charged with.  That is the law.  I

5    will take care of that.

6              You may proceed.

7    QUESTIONS FROM MR. NGONO BY MR. SPILKE:

8    Q.  Without discussing any --

9              THE COURT:  Without discussing the law.

10   Q.  Without discussing the law and without discussing any

11   conversations that may have taken place, did you come to learn

12   that you had been let go from Metro One?

13   A.  Luc Owono inform me that they have already call him that I

14   will not be going there.  But, however, because when you work,

15   I was the one who needed to go to Manhattan, because we work

16   one week in advance, like, you get paid, you get paid one week

17   in advance, because the check was not to be deposited at Metro

18   One.  I was to go there myself to actually take the envelope

19   and turn it to Luc Owono.

20             So when I went to Metro One office, I believe three

21   days later.  This is where the clerk told me, You know what?

22   You have to sign this document.  And I said, What are the

23   document?  I don't sign document.  They had to sign the

24   documents.  And they say, Oh, if you come here to pick the

25   check, then there is no way you are going to get this check

1    unless you sign it, or you put a comment.  So I put "no

2    comment," and I got the check and left and gave it to Luc

3    Owono.

4            Now, before that, before I was fired at Barnes &

5    Noble, I was already informed that because the marriage thing

6    didn't work, because when my wife left, at some point she said

7    she was going to file for divorce because I couldn't go to

8    Utah.  What my wife didn't know, that I couldn't move to Utah

9    because my time was not up yet.  But she wanted me to move to

10   Utah after she left in June, somewhere in June or March -- May.

11   When she left, she said I have to move there with her after my

12   daughter from school was over during summertime.  But I

13   couldn't move there in the summertime because I was still under

14   the contract.  But I didn't want to discuss all this with her.

15   I said, You know what?  I want to move, but I'm not ready yet.

16   And she said, You know what?  I'm going to file for divorce.  I

17   said, Fine.

18           MR. LONGYEAR:  Your Honor.

19           THE COURT:  Striking whatever Mr. Ngono says his wife

20   said, because it is hearsay.  So don't tell me what other

21   people said.  You can say what you said and you can say what

22   you did after somebody said something, but you don't tell me

23   what they said, okay?

24           MR. NGONO:  Yes, your Honor.

25   A.  So my wife filed for divorce, well, she filed for divorce

h522ngo1                              Ngono - Direct

1    she informed me she was going to file for divorce, and I told

2    her, Well, I am not coming to Utah.  Basically the divorce

3    would take 90 days.  She just file for it.  90 days will be

4    consumed.  I then will be a divorce.  So I move on.  And I move

5    on.  I knew 90 days divorce; so, in my mind, I just learned

6    with this case, this is only when I just learn that a divorce

7    was actually finalize in 2013.  I never knew a divorce was this

8    long because -- I knew that the divorce was going to get in by

9    the end of 2011.  Then I received e-mail asking me to sign some

10   paperwork.  I didn't even read those e-mail.  You want to

11   divorce me, all right, so I moved on.

12          But when I was moving on, this is when Luckendy

13   organization informed me that since I'm going to be in limbo

14   also, they have a better deal for me.  And the deal was that

15   they wanted to make me a manager in one of their travel agency.

16   As you know, they have a travel agency.  They wanted me to run

17   that travel agency because they had many companies and they

18   needed a manager.  I said, All right.  But the condition to be

19   that manager was that I needed at least a bachelor degree.

20   Q.  Did you ever attend Micropower Career Institute?

21   A.  No, never attended Micropower Career Institute.

22   Q.  But at some point you started school, right?

23   A.  Yes.  That was in --

24   Q.  When was that?

25   A.  -- 2011, fall 2011.  This is when I was informed that I

h522ngo1                          Ngono - Direct

1    have a job lined up, because my time is coming in, coming up at

2    the end of 2011.  But if I have -- if they help me get a

3    bachelor degree, I will actually have an actual salary that the

4    organization was going to pay fully for me to obtain a bachelor

5    degree.  This is when they filed application online for CUNY

6    College.  Can you put that up?

7    Q.  Again, when was this?

8    A.  That was 2011.

9    Q.  And looking at Exhibit H, which is still on the screen,

10   were you working for any of these organizations at that time?

11   A.  I did not work for Securitas Security.  Securitas Security

12   Services.  I never work in there.

13   Q.  Any of the organizations?

14   A.  Excuse me?

15   Q.  Were you working for any of these organizations at the time

16   that you are speaking about, the fall of 2011?

17   A.  That was Metro One.  I left Metro One September 9, 2011.

18   But before I left, the manager position for the travel agency

19   was already lined up.  All I needed to do is take a test.  So I

20   took that test and passed the test.  I think it was like basic

21   mathematics skills and English writing, so I passed the test.

22   It turns out that test was actually the admission to college

23   that they had already put an online -- they had applied online.

24        MR. SPILKE:  Ms. Satinover, could you put up

25   Government Exhibit 200 which is in evidence?

h522ngo1                        Ngono - Direct

1    QUESTIONS FROM MR. NGONO BY MR. SPILKE:

2    Q.  What is this document?

3    A.  I have no idea.  That from what I read is City University

4    of New York, but I don't know how they did it, but I was just

5    told that I would go to CUNY.  This is an application that I

6    never did myself.

7    Q.  And at some point you did attend school at the City

8    University of New York, right?

9    A.  Yes.

10        MR. SPILKE:  Ms. Satinover, could you put up

11   Government Exhibits 2 and 3.  Would you mind just zooming in on

12   just the card.

13   QUESTIONS FROM MR. NGONO BY MR. SPILKE:

14   Q.  Looking at Exhibits 2 and 3, what are these?

15   A.  Yes, these are my ID card.  So basically when I was sent to

16   study at LaGuardia, I started studying at LaGuardia.  I had

17   never been to college before.  So I was just trying my best,

18   because I know my job was coming up as a manager.

19        But all of a sudden, as I was in LaGuardia, I was

20   told, You will be transferred to Hunter for no reason.  So

21   that's when I was transferred to Hunter.

22        What they basically did, they will print orientation

23   paper online, it's a document that they receive online for

24   orientation, they will print that from the office, and they

25   gave it to me.

h522ngo1                           Ngono - Direct

1              When I show up, when I first show up at LaGuardia,

2       They brought me there.  But for Hunter, I already had the

3       paper, because I already know how college function.  I don't

4       need the orientation paper.  Luc O. Ndi, after orientation,

5       then I was already in as a student, so I was coming as a

6       transfer student.  So I was study again --

7              THE COURT:  Slow down, slow down.

8       A.  So I keep studying at Hunter.  Basically bachelor degree is

9       four years.  So transferring me from -- because you need 60

10      credit at a community college to transfer, but when they

11      transfer me, I didn't have 60 credit and when you transfer with

12      that --

13             MR. LONGYEAR:  Objection, your Honor.

14             THE COURT:  Yup.  Move on.

15      A.  So I transfer, and I lost credit, which mean I already had

16      time lending to graduate in four years, and it was 30.  Again

17      in 2014, transfer again for no other reason.  This is when I

18      started to believe that something was wrong with this transfer,

19      because there is no way that you could go to school and all of

20      a sudden we have all these people, study group, working with

21      them, and all of a sudden you are told, oh, you got to transfer

22      to go to another school.  So I suspected that maybe they don't

23      have the position, the managing position that they had, because

24      they reassured me that school was completely -- was paid by the

25      organization.

h522ngo1                              Ngono - Direct

1              MR. LONGYEAR:  Objection.

2              THE COURT:  Sustained.  Strike that.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H525ngo2                        Ngono - direct

1   A.   So they were taking care of everything when I was in

2   school, but it was frustrating because I don't know how long it

3   was going to take me to even get to that position because I

4   also have, at this point, my daughter is also going to school,

5   I'm thinking like what am I going to do?  No money, no job, but

6   my daughter, in 2013, she was right there.  I am thinking about

7   college like what is going to happen when she get to twelfth

8   grade, what am I going to do with her because I'm not here

9   myself to go to school, I am here for her so I am here to work.

10  All this was, to me, a waste of time, so that's when in 2007

11  when they transferred me from, to CCNY, I knew they didn't want

12  me to graduate.  I knew something was wrong.  This is when I

13  asked them, I asked specifically Luc Owono, because in 2014 I

14  was no longer under the servitude, I wasn't their slave

15  anymore, I was free.  So, technically, this whole thing was for

16  me to get a better position but now that it is taking longer I

17  needed to get out of there.

18            THE COURT:  Let me stop you.  Just a minute.

19            Okay.  You may continue.

20  BY MR. SPILKE:

21  Q.   So, you really did attend school?

22  A.   Yes.  I was attending school with the false belief that I

23  would get a job after four years but in 2014 I realized that

24  something was wrong.  This is when I asked, because I didn't

25  tell them that I was a slave, I'm not going to tell them,

H525ngo2                          Ngono - direct

1   people in the school that, you know what?  I came here as a

2   slave.  I was trying to act normal like everybody else.  Why

3   should I tell people I work as a slave?  And so, I kept my

4   things to myself but as I was talking to other students, they

5   have their plan.  Most of them now are nurses, PA, but if we

6   were talking I'm trying to figure out what was I going to do.

7   This is when I figure out like I can get a part-time job with

8   them within the organization because they have places where

9   they can put you to work because they have people working for

10  them.

11          Now, instead of working for free, they can actually

12  pay me because I have served my five years.  This is when I

13  asked the two leaders, Contact 1 and Luc Owono, like, all

14  right, I didn't want to bring the whole transfer thing because

15  I was really -- it was frustrating.  I didn't want to be that

16  upset.  I knew if they came back with another transfer I wasn't

17  going to go anywhere but then I asked them, can they find me a

18  job again just like I was working with them but with an actual

19  salary.

20  Q.  Before you go into that, how were you doing in school?

21  A.  I was trying my best; studying.  I have to do my -- at this

22  point it was really hard because my daughter started to get

23  into algebra and all that, I have to, like, homework became

24  worse.  It used to be easier, it started to come with theories

25  and theorems and all of that.  So, I have to go study myself,

1    study for my daughter also.  So, it wasn't easy, but I was

2    keeping up with schoolwork because I didn't -- never failed a

3    single class in my career in school.

4    Q.  Would you please bring up Government Exhibit 207, which is

5    already in evidence?  Can we just highlight sort of the center

6    left portion where the grades are?

7                MS. SATINOVER:  Sorry.  Can you say that again?

8                MR. SPILKE:  Center left portion there.

9    Q.  What are we looking at here?

10   A.  These were the tests, this is a transcript.  This is a

11   transcript.

12   Q.  Ms. Satinover, can we turn to page 2?

13               MS. SATINOVER:  Which section would you like me to

14   zoom in on?

15               MR. SPILKE:  I suppose we should do it in sections,

16   just semester by semester.

17   Q.  What are we looking at here?

18   A.  Those are my transfers, my transfer credits from LaGuardia

19   to Hunter.

20               Here is basically, this is Hunter, actually.  Hunter.

21   Those are my grades so I had a hard time with -- actually, the

22   one on the bottom, this is what I wanted to do WGS.  No, no,

23   where we were.  It was the last line, WGS 201.  And this is

24   what I wanted to be, a major.  This is woman and gender because

25   I ended up liking this part because the instructor was

H525ngo2                          Ngono - direct

1   phenomenal so I decided to be, do this major because all they

2   needed me to do to have a bachelor degree.  I wasn't interested

3   in all these things because these are hard.  This is what I was

4   thinking.  I would stay at Hunter and graduate but then I was

5   transferred to -- I was transferred to CCNY.  Even the art

6   history, art history on 18th Century, it was basically Rococo.

7             THE COURT:  I don't think we need to go into this.

8   Let's move on.

9   Q.  Were you still in school in 2015?

10  A.  Yes.

11  Q.  And while you were in school, did you also work?

12  A.  That's in 2014.  This is when they transferred.  I didn't

13  want a transfer and I specifically asked them in a very polite

14  manner, like is there a way -- I know you are going to give me

15  a job but is there a way because I need money, is there a way

16  you can get me work within the organization and with actual

17  pay?  This is when Luc say, all right.  I will get you a job,

18  part-time job, but you have to give me half of the salary.

19            MR. LONGYEAR:  Objection, your Honor.

20            THE COURT:  Yes.  Do not tell us what Mr. Owono

21  allegedly said.

22  A.  Yes --

23            THE COURT:  Wait a minute.

24            THE WITNESS:  Yes, your Honor.

25            THE COURT:  So, I am striking what he said Mr. Owono

1    said.

2    BY MR. SPILKE:

3    Q.   Without telling us what anyone else said --

4    A.   Yes.

5    Q.   -- at some point did you start working in 2014 while you

6    were still in school?

7    A.   Yes.  He obtain me a job at Bloomingdale's.

8             Can you bring the Bloomingdale's card?

9             MR. SPILKE:  May I approach, your Honor?

10            THE COURT:  You may.

11   Q.   I am showing the witness what is marked or will be marked

12   for identification as Government Exhibit -- I'm sorry,

13   Defendant's Exhibit K and L.  Can you please tell us what those

14   are?  Do you recognize them?

15   A.   Yes.

16   Q.   What are they?

17   A.   These are Bloomingdale's I.D. -- employee I.D. and these

18   are the job that was obtained for me and this is an employee

19   card.

20   Q.   They're I.D. cards?

21   A.   Employee I.D. cards, yes.

22   Q.   From a company?

23   A.   Bloomingdale's.

24   Q.   And did you possess those cards?

25   A.   Yes.

H525ngo2                          Ngono - direct

1   Q.  At some point did you lose possession of those cards?

2   A.  No.

3   Q.  Were you arrested at some point and your wallet taken?

4   A.  Yes, my wallet was taken and all my I.D. was in my wallet.

5   Q.  And you didn't have possession of those cards at that

6   point?

7   A.  No.  The agent took my wallet and I didn't have

8   identification.

9   Q.  But, did those cards like look the same when they were

10  taken from you?

11  A.  Yes, these are my cards, my Bloomingdale's card and

12  Bloomingdale's employee I.D.

13          MR. SPILKE:  At this point, defense offers Defendant's

14  Exhibit K and L into evidence.

15          THE COURT:  Which is which?

16          MR. SPILKE:  K is a Bloomingdale's identification

17  card, and L is a Bloomingdale's loyalty-type credit card.

18          MR. LONGYEAR:  No objection from the government, your

19  Honor.

20          THE COURT:  All right.  Defendant's Exhibit K and L

21  received in evidence.

22          (Defendant's Exhibits K and L received in evidence)

23          MR. SPILKE:  Permission to publish, your Honor?

24          THE COURT:  Yes.

25  BY MR. SPILKE:

1    Q.   When did you receive these cards?

2    A.   I received these cards in 2014 when I started working at --

3    I believe 2014 when I started working at Bloomingdale's.

4    Q.   And what was -- how did you apply for this job?

5    A.   I not apply for this job.  I was placed there because I

6    asked for a part-time job as I was going to school.  Then, when

7    they apply online, I was given an invitation letter in there,

8    that was printed.  And that invitation was an invitation to

9    orientation at Bloomingdale's.  So, I went there for five days

10   orientation.  When you got there all you need to do to get

11   through the employee entrance, you show that letter.  Then I

12   was admitted to the orientation on the 10th floor.  After five

13   days, they instruct what we should do, they instruct about our

14   ethics, the moral ethics.

15           THE COURT:  Please, I don't need to hear about that.

16   Let's keep going.

17   Q.   Did you receive orientation from Bloomingdale's?

18   A.   Yes.  It was five days.

19   Q.   And then you began working there; is that right?

20   A.   Then the employee I.D. was issued and I started working

21   there at part-time and going to school full-time, but the

22   payment, the salary was to be split half.  I only have half of

23   what I was getting paid for.  And my job was at the visitor

24   center which is basically at the main floor by the jewelry

25   section as you enter Bloomingdale's and the jewelry section.

H525ngo2                          Ngono - direct

1   The visitor center is at the back with -- you have the desk.

2              So, what we basically do at the business center, we

3   open credit cards to our customers, store credit cards, so we

4   deal with a lot of identities, personal information.  We deal

5   with more than a year I opened -- because we have to open as a

6   part-time employee, you are required to open at least two

7   credit cards per week.  If you fall below that standard --

8              MR. LONGYEAR:  Objection, your Honor.

9              THE COURT:  Yes.  Just a second.

10             So you worked at Bloomingdale's.  How long did you

11  work there?

12             THE WITNESS:  More than a year.

13             THE COURT:  Move on.

14  Q.   What were your responsibilities?

15  A.   Customer service, visitor center, but I also do sales

16  because once you are a Bloomingdale's employee, you only need

17  your I.D. number, you can do sales anywhere, but we do not do

18  sales because all the sales associates heavily depend on the

19  sales because they only get paid on the sales.  If they don't

20  sell, they don't get money but we, as employees, we get

21  salaries regardless whether we sell or not so we don't do sell

22  that much.  If I have a customer that actually wanted to buy

23  something, I would rather find somebody who depends on the

24  percentage of sale and give them because they don't have --

25  they don't have -- they have a base salary that is literally

H525ngo2                          Ngono - direct

1    nothing.

2             THE COURT:  Okay, I don't need to hear about what

3    other people have.

4    A.  Yes.

5             So, we didn't do sales.

6    Q.  Just so we are clear, which location of Bloomingdale's are

7    you speaking about?

8    A.  59th Street, flagship store.

9    Q.  And you were saying as part of your responsibilities you

10   understood that you -- you understood that -- strike that.

11            As part of your responsibilities --

12            THE COURT:  You can withdraw it.  I'm the one that

13   strikes them.

14            MR. SPILKE:  Sorry, your Honor.  Yes, I withdraw it.

15   Q.  As part of your responsibilities, it was your understanding

16   that you were -- that you opened credit card accounts, right?

17   A.  Store credit cards, yes.

18   Q.  And did you receive identification information?

19   A.  Millions of identification information.

20            THE COURT:  Just a second.  Come up here.

21

22

23

24

25

H525ngo2                        Ngono - direct

 1                  (At side bar)

 2                  THE COURT:  Where are you going with this?

 3                  MR. NGONO:  I'm going that I'm not an I.D. theft.

 4                  THE COURT:  Right, no.  You don't go there.

 5             If you were exposed to other I.D.s and didn't use

 6     them, that does not mean that you didn't do what you have been

 7     charged with.  So, don't tell us about what you did when you

 8     were exposed to I.D.s.  Okay?

 9                  MR. NGONO:  Yes, your Honor.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. SPILKE:

3     Q.  Let's move on.  At some point you applied for what is known

4     as DACA relief?

5     A.  Yes.

6     Q.  When did you apply for -- first, can you tell us what you

7     understand DACA to be?

8     A.  DACA, what I understood, is that I would get an employment

9     authorization card.  That's what I applied for it.  And it was

10    also Deferred Action for Childhood Arrival, leading to an

11    employment authorization card and that's what I needed.

12    Q.  When did you apply for DACA?

13    A.  Because there is fees associated with the DACA application

14    so I needed to work first.  And I saved up enough money from

15    Bloomingdale's, then I applied for DACA in, I believe, 2015.

16    Q.  Can we pull up Government Exhibit 12A already in evidence?

17         What are we looking at?

18    A.  This is my employment authorization card that was issued to

19    me by the Department of Homeland Security.

20    Q.  You received this card?

21    A.  Yes.

22    Q.  And when was that?

23    A.  I received it card around -- in 2015, December or January

24    2016.

25    Q.  Thank you, Ms. Satinover.  You can take that down.

1          Did you ever apply for a New York State I.D.?

2    A.  Yes.  Once I received my employment authorization card,

3    then I went to DMV and I apply for my New York State I.D.

4    Q.  Can we pull up Government Exhibit 13A already in evidence?

5          What are we looking at here?

6    A.  This is my New York State I.D. that I applied for.  I

7    applied for this card in the Bronx and I went to the DMV

8    myself.  This is where I applied for the card and it was --

9    they said -- the lady told me it would take 10 days to get my

10   card and it actually took, I believe, seven days and my card

11   came in the mail.

12         MR. SPILKE:  May I briefly confer with the witness?

13         THE COURT:  Yes, you may.

14         (Standby counsel and witness conferring)

15         MR. SPILKE:  No further questions, your Honor.

16         THE COURT:  All right.  Thank you.

17         Ladies and gentlemen, we are going to take our morning

18   recess at this time.  As you know, do not discuss the case, and

19   we will come and get you in approximately 10 minutes.

20         (Continued on next page)

21

22

23

24

25

H525ngo2                          Ngono - direct

1              (Jury not present)

2              THE COURT:  Please, be seated.

3              Mr. Longyear, approximately how much time do you think

4    you will be on cross-examination?

5              MR. LONGYEAR:  Probably not more than 30 minutes, your

6    Honor.

7              THE COURT:  All right.  And then I assume there may be

8    some redirect after that.  Do you plan on putting on a rebuttal

9    case?

10             MR. LONGYEAR:  Not at this time, your Honor.  No, your

11   Honor.

12             THE COURT:  All right.  Let's take a break.

13             MR. LONGYEAR:  Thank you, your Honor.

14             (Recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H525ngo2                          Ngono - cross

1           (Jury present)

2               THE COURT:  Please be seated, ladies and gentlemen.

3               It appears that you are ready to begin your

4       cross-examination, Mr. Longyear.  Please proceed.

5               MR. LONGYEAR:  Thank you, your Honor.

6       CROSS EXAMINATION

7       BY MR. LONGYEAR:

8       Q.  Good morning, Mr. Ngono.  How are you?

9       A.  Good morning, Mr. Longyear.  Good.

10      Q.  Mr. Ngono, you testified that you entered the country on

11      December 7th, 2006; correct?

12      A.  December 7, 2006.  Absolutely correct.

13      Q.  And you entered under the name André Ngono?

14      A.  Correct.

15      Q.  Now, Mr. Ngono, you testified about this organization that

16      brought you over to the United States to work, correct?

17      A.  Correct.

18      Q.  And as part of that organization, you testified that they

19      got you a job with Pentagon Protection, correct?

20      A.  Correct.

21      Q.  And you testified that as part of that arrangement you

22      worked for Pentagon, correct?

23      A.  Absolutely not.

24      Q.  You were not employed by Pentagon Protection?

25      A.  Never worked for Pentagon Protection.  You want me to

1   explain?  I will explain.

2           I worked for the organization that provided services

3   to Pentagon that provided services to -- I worked for the

4   organization that provided services to Pentagon Protection,

5   that provided services to real estate, and that real estate had

6   a contract with the building at 2002 Fifth Avenue.  This is a

7   chain of transaction.  I didn't provide service to the

8   building, I didn't provide service to that real estate that

9   owned that building and I didn't provide service to Pentagon

10  that provide service to that real estate.  I only provided

11  services to Luckendy Real Estate that provided services to

12  Pentagon.

13  Q.  Mr. Ngono, you testified on direct examination that you

14  reported as a doorman at 2002 Fifth Avenue, correct?

15  A.  Correct.

16  Q.  And that was under Pentagon Protection, correct?

17  A.  Under Luckendy Real Estate, who provided services to

18  Pentagon.  I --

19  Q.  You worked as a --

20          THE COURT:  Wait.  Let him put a question.

21  Q.  You worked as a doorman at that building, sir?

22  A.  Yes, I did.

23  Q.  You wore a uniform?

24  A.  Suit, yes.

25  Q.  And, it is your testimony that as you reported to this

H525ngo2                        Ngono - cross

1    building every day to work, payments were made to Luckendy --

2    A.   Organization.

3    Q.   The Luckendy organization?

4    A.   Correct.

5    Q.   So they got the money while you worked, correct?

6    A.   That's what the contract that I signed from Africa.

7    Q.   And as part of that arrangement with Pentagon, you provided

8    fingerprints to Pentagon Protection; is that correct?

9             THE COURT:   Can you do me a favor and slow down with

10   your questioning?

11            MR. LONGYEAR:   I'm sorry your Honor.

12            THE COURT:   Thank you.

13   BY MR. LONGYEAR:

14   Q.   As part of your arrangement with this organization at

15   Pentagon, you provided fingerprints at Pentagon Protection,

16   correct?

17   A.   Not correct.  I will repeat that for you to understand.

18            THE COURT:   No, no, no.  You are not giving lectures.

19            THE WITNESS:   All right.

20            THE COURT:   Just answer his questions.

21            THE WITNESS:   Not correct.  I did not provide

22   fingerprint --

23            THE COURT:   Okay.  One at a time, please.

24            Are you saying it is not correct?

25            THE WITNESS:   I did not -- I am saying I provided

750

H525ngo2                              Ngono - cross

1    fingerprints but I did not provide fingerprints to Pentagon.  I

2    provided --

3                THE COURT:  No, no.

4                THE WITNESS:  All right.

5    BY MR. LONGYEAR:

6    Q.  Now, Mr. Ngono, this international criminal organization

7    that brought you over to the United States, you testified that

8    Luc Owono was an organizing member of this organization; is

9    that correct?

10   A.  Part of the organization.

11   Q.  And this individual known as Contact 1, he was also part of

12   this organization?

13   A.  Part, P-A-R-T.

14   Q.  And this organization, as you testified, brought

15   individuals, in particular men, between 20 and 25 years old

16   from Africa to the west; is that right?

17   A.  Correct.

18   Q.  But, in your situation, this criminal organization also

19   allowed you to bring your daughter; is that correct?

20   A.  Absolutely correct.

21   Q.  And in term -- as I understand from your direct testimony,

22   the deal was you worked for five years, correct?

23   A.  That's correct.

24   Q.  So that from the date that you entered to five years from

25   that date, that's the term of your contract?

1    A.  Not from the date that I enter.  I enter December 7, 2006,

2    and the day that was running was December 8th, that was another

3    day that I entered.

4    Q.  Fair enough.  So, the day after you entered, that started

5    the clock on five years?

6    A.  That's when my clock started.

7    Q.  Okay.

8            Mr. Ngono, who is Contact 1?

9    A.  Contact 1 is C-O-N-T-A-C-T.

10           THE COURT:  He knows how to spell it.  He asked who is

11   he.

12   A.  He is a man that is part of the organization.

13   Q.  Does this man have a name?

14   A.  Does he have a name?  I was given Contact 1 from the

15   beginning, that we would be picked up at the airport.  This

16   organized crime is by layer.  I don't have -- I don't have to

17   explain this to you, Mr. Longyear.  They have names, you might

18   not even know the names.  Contact 1 was picking up at the

19   airport in the white van.  You see this card, you will be

20   picked up and you will be under his order.

21   Q.  So you arrived at JFK Airport?

22   A.  JFK Airport.

23   Q.  And were you walking through the airport searching for

24   Contact 1?

25   A.  Have you ever been in an airport arrival?  People have

H525ngo2                         Ngono - cross

1    cards at the exit.  You get --

2    Q.  My question was when you arrived at JFK Airport --

3    A.  Yes.

4    Q.  -- is it your testimony that you then had to search for

5    this Contact 1?

6    A.  I look for the card.  You are going to see the sign on your

7    card, that's your contact, and you will be picked up there and

8    you will be under his order.  And I followed the order.

9    Q.  So, this organization that -- it brought you over to the

10   U.S., correct?

11   A.  Correct.

12   Q.  And it brought your daughter over to the U.S., correct?

13   A.  My daughter is only 12, please.

14   Q.  This organization --

15   A.  Me.

16   Q.  -- under your testimony, brought you and your daughter?

17   A.  Objection.

18            THE COURT:  No.  No, no, no, no.  You are on

19   cross-examination and he can ask questions.  You gave testimony

20   about your daughter.  You opened the door for him to ask

21   questions.

22            THE WITNESS:  Thank you, your Honor.

23   BY MR. LONGYEAR:

24   Q.  This organization also brought your daughter over with you,

25   correct?

H525ngo2                          Ngono - cross

1    A.  Yes.

2    Q.  And this organization set up opportunities for you to work

3    while the organization got paid, correct?

4    A.  Not correct.  I was brought -- I want to make this clear to

5    you, I was brought under contract that I will work for them for

6    five years.

7    Q.  But you worked at jobs in New York City, correct?

8    A.  I worked for them whether the job is in Los Angeles,

9    whether the job is in California.  You go -- I go where I'm

10   told to go.

11   Q.  But it is also your testimony that this international

12   criminal organization put you in places with flexible schedules

13   such that you could care for your daughter, correct?

14   A.  Because my own request -- they didn't have to do.  Again,

15   if you remember my testimony, my daughter have a very luxury

16   life in Africa.  In a village I have luxury life.  I came here.

17   My daughter is, was the reason I came here and that was clear

18   from the beginning.  And my daughter has no dealing with the

19   organization.  I was the one dealing with them.

20   Q.  But it is your testimony that this international criminal

21   organization that engaged in slave trade or slave labor --

22   A.  Yes.

23   Q.  -- allowed you to work a flexible schedule and worked

24   around your child care needs; is that correct?

25   A.  That's what I requested.

H525ngo2                          Ngono - cross

1    Q.  And this international criminal slave trade organization

2    granted that request?

3    A.  Absolutely correct.

4    Q.  Okay.

5            Now, you also testified that you had a five-year

6    contract with this international criminal organization,

7    correct?

8    A.  I will repeat it a hundred times; yes, and yes.

9    Q.  And this international criminal slave trade organization

10   adhered to the exact date, the five-year date of the contract,

11   correct?

12   A.  It was there before I was born.

13   Q.  You worked for five years with them, correct?

14   A.  Yes.

15   Q.  And this international criminal organization that engages

16   in slave labor and moving individuals from Africa to the west

17   in order to work as slaves --

18   A.  Yes.

19   Q.  -- they adhere to the five-year date on that contract,

20   correct?

21   A.  It was here before I was born.

22   Q.  You came here on December 7th, 2006 correct?

23   A.  Correct.

24   Q.  And your contract, under your testimony, started on

25   December 8th, 2006, correct?

1    A.   Correct.

2    Q.   And it is your testimony that this international criminal

3    organization, your contract with them ended on December 8th,

4    2011, correct?

5    A.   Absolutely not correct.

6         Did I say in addition to five years slave labor you

7    have, they will help you get, obtain a green card.  Now, they

8    will use for an additional five years, I'm not sure if you get

9    that part.

10   Q.   You testified on direct examination, sir, that the contract

11   length was five years, correct?

12   A.   The contract -- I'm going to repeat this again.  The

13   contract was five years as free labor.  While the contract is

14   running, the organization help us whether you are from

15   Australia, Germany, Spain.  You have a United States.  They

16   will help you obtain legal status.  Once you obtain that legal

17   status, they will then use those documents for five years even

18   though you are free, but they will use the legal standard that

19   they sponsor you in this case, the in America, green card, they

20   sponsor you for that they will use that green card for four

21   years and open other small businesses whether you like it or

22   not.

23   Q.   Now, and Mr. Ngono, after your five-year term of working

24   for this organization ended, you testified on direct

25   examination that they helped you get an education; is that

1    correct?

2    A.  Correct.  They didn't have -- they wanted to offer me a job

3    for help me get an education, the business, okay?  December 8

4    is approaching, will you be willing to take a position as a

5    manager in a travel agency?  Yes, but then getting a position

6    at a travel agency required at least a bachelor degree that

7    will be paid fully by the organization.

8    Q.  So the organization paid for your education; that's your

9    testimony?

10   A.  That's correct, yes.

11   Q.  Mr. Ngono, you testified on direct examination you attended

12   LaGuardia Community College, correct?

13   A.  I did.

14   Q.  You attended Hunter College; is that correct?

15   A.  Correct.

16   Q.  You attended City College; is that correct?

17   A.  Correct.

18   Q.  And, in connection with that, with your attendance at those

19   schools you received federal financial aid; is that correct?

20   A.  I did not.  I was attending school as a skill, to obtain

21   skill for my position as a manager, and if you call it,

22   financial aid was paid for the organization.

23           THE COURT:  Wait, wait, wait.  Slow down.  Say that

24   again.

25   A.  His -- the question -- can you repeat the question?

1          THE COURT:  You attended City College; is that

2     correct?

3     A.   I attended the City College, and the question was did I

4     receive financial aid.  My financial aid was paid by the

5     organization.  I will say that and repeat that a hundred times.

6     BY MR. LONGYEAR:

7     Q.   Your financial aid was paid by the criminal organization?

8     A.   The cost -- the cost of my schooling, if you call that

9     financial aid, I don't know how you call it, the costs,

10    tuition, and fee of my school attendance was fully paid by the

11    organization.

12         Shall I remind you of --

13         THE COURT:  No, you shouldn't.  You are being

14    questioned.  Put your next one, please.

15         MR. LONGYEAR:  Thank you, your Honor.

16    BY MR. LONGYEAR:

17    Q.   So, sir, it is your testimony that you didn't receive any

18    money as a result of your attendance at LaGuardia Community

19    College, Hunter College, or City College; is that correct?

20    A.   That I didn't receive any money?

21    Q.   Correct.

22    A.   For -- objection, your Honor.

23         THE COURT:  Come up here.

24

25

H525ngo2                           Ngono - cross

1           (At side bar)

2                MR. NGONO:  Yes.  I'm objecting because I have already

3      said what happened between financial aid and the Luckendy

4      organization.

5                THE COURT:  He has a right to cross-examine you on

6      what you said about that.  No more objections from you.  No

7      more objections on this.  Your cross-examination.  If you

8      opened the door he is entitled to go in and ask questions.

9                MR. NGONO:  Yes.

10               THE COURT:  You can't limit that.  All right?

11               MR. NGONO:  Yes, your Honor.

1              (In open court)

2              THE COURT:  Would you like to rephrase that question,

3    maybe break it down?

4              MR. LONGYEAR:  Thank you, your Honor.

5    BY MR. LONGYEAR:

6    Q.  Mr. Ngono, it is your testimony on direct examination that

7    you didn't receive any money as a result of attending

8    LaGuardia, Hunter College or City College, correct?

9    A.  Correct.

10   Q.  The international criminal organization arranged for you to

11   attend those schools, correct?

12   A.  Correct.

13   Q.  And they arranged to have you -- to pay for the education;

14   is that correct?

15   A.  Correct.

16   Q.  Mr. Ngono, there came a time when you received unemployment

17   insurance; is that correct?

18   A.  Not true.  Not correct.

19   Q.  You testified on direct examination that you married

20   Lindsey Pitcher, correct?

21   A.  Correct.

22   Q.  And you lived at 66-87 Forest Avenue, is that correct?

23   A.  Correct.

24   Q.  You lived at 607 Woodward Avenue?

25   A.  Correct.

1    Q.  Ms. Satinover, can we please put up Government Exhibit 401,

2    please, page 2?  Can we zoom in on that?

3           Mr. Ngono, we saw this document on from Tracy Dangott

4    from Chase.  This shows that a debit card was mailed to 607

5    Woodward Avenue; is that correct?

6    A.  That's correct.

7    Q.  And that is where you lived?

8    A.  That is the organization address and I live rent free.

9    Q.  Now, you testified on direct examination that you had

10   nothing do with the application process at CUNY; is that

11   correct?

12   A.  Correct.

13   Q.  Ms. Satinover, can we turn to page -- to the next page on

14   401, please?  Can we zoom in on the row April 4th, 2011.

15           Do you see that sir, that $65 payment?

16   A.  Yes.

17   Q.  So the card that was mailed to your address at 607 Woodward

18   Avenue, that's what was used to pay for the CUNY application;

19   isn't that right?

20   A.  Not right.

21   Q.  I'm sorry?  Not right?

22   A.  You say is that right?

23   Q.  I said is that right.

24   A.  Not right.

25   Q.  So this business record is incorrect?  Is that your

H525ngo2                          Ngono - cross

1   testimony?

2   A.   Again, for another time, the addresses where I lived was

3   rent-free and paid fully by Luckendy Realty, and whatever came

4   in the mail was the responsibility -- all mail was managed by

5   those in charge of those subsidized rent, so I did not receive

6   mail.  The only mail that I received everywhere I live

7   rent-free was my daughter's school communication, period.

8   Q.   Now, Mr. Ngono, you testified on direct examination about a

9   September 2000 visa.  Do you remember that?

10  A.   September?  Yes.

11  Q.   A visa that was issued in the name of André Marie Ngono?

12  A.   Yes.

13  Q.   And it is your testimony that was not you?

14  A.   I don't know who it is.

15  Q.   Ms. Satinover, can we publish Government Exhibit F -- I'm

16  sorry.  Excuse me.  Defendant's Exhibit F.  Can we zoom in on

17  that photograph, please?

18          Mr. Ngono, it is your testimony that is not a picture

19  of you?

20  A.   That is not me.

21  Q.   That's not you?

22  A.   Nope.  And I also do believe that we all look alike --

23          THE COURT:  Oh.  Oh.

24          THE WITNESS:  Yes.

25          THE COURT:  That is stricken.

1    Let me advise you that you are to answer the

2    questions, not throw in comments.

3         THE WITNESS:  Yes, your Honor.

4    BY MR. LONGYEAR:

5    Q.  Ms. Satinover, we can take that down.

6         Now, Mr. Ngono, you testified on direct that you

7    applied for relief under what's called a Deferred Action for

8    Childhood Arrival; is that correct?

9    A.  Yes.  Correct.

10   Q.  And as a result of that application you received an

11   employment authorization card; is that correct?

12   A.  Correct.

13   Q.  Now, Ms. Satinover, can we pull up Government Exhibit 106

14   and can we focus on page 3 on the full legal name?

15        Do you see that, sir, items 3A and 3B?

16   A.  Yes.

17   Q.  That's your name?

18   A.  Yes.

19   Q.  Luc Ndi, that's your name?

20   A.  Yes.

21   Q.  Ms. Satinover, if we can turn to the to page 4 on this

22   application, if we can zoom in on the date of birth.

23        Sir, on this application you put in August 24th, 1986?

24   A.  That is my date of birth, yes.

25   Q.  That's your birthday?

H525ngo2                          Ngono - cross

1    A.  Yes, sir.

2    Q.  Ms. Satinover, can we turn to page 7 of the application --

3    sorry, page 7 of the exhibit.  Can we focus in on the

4    requestor's certification?

5            Is that your signature, sir?

6    A.  Yes.

7    Q.  And under there, I will read it into the record:

8            I certify, under penalty of perjury under the laws of

9    the United States of America, that the foregoing is true and

10   correct, and that copies of documents submitted are exact

11   copies of unaltered original documents.  I understand that I

12   may be required to submit original documents to United States

13   Citizenship and Immigration Services (USCIS) at a later date.

14   I also understand that knowingly and willfully providing

15   materially false information on this form is a federal

16   felony --

17   A.  Objection, your Honor.

18           THE COURT:  The document is in evidence.  Do not

19   interrupt.

20           You may complete reading it.

21           MR. LONGYEAR:  Thank you, your Honor.

22            -- providing materially false information on this

23   form is a federal felony punishable by a fine, imprisonment up

24   to five years, or both, under 18 U.S.C. Section 1001.

25   Furthermore, I authorize the release of any information from my

H525ngo2                          Ngono - cross

 1    records that USCIS may need to reach a determination on my

 2    deferred action request.

 3              Do you see that, sir?

 4    A.  Objection.

 5              THE COURT:  The answer is either yes or no.  Did you

 6    see it?

 7    A.  I have an objection, your Honor.

 8              THE COURT:  Overruled.

 9    Q.  Sir, do you see that language on that page?

10    A.  Yes.

11    Q.  Did you read that language when you reviewed the

12    application?

13    A.  I did not.

14    Q.  Ms. Satinover, can we please turn to page 5 of the PDF?

15              Now, sir, it is your testimony that you entered the

16    country on December 7th, 2006, correct?

17    A.  Absolutely correct.

18    Q.  Ms. Satinover, can we zoom in on the bottom right-hand

19    portion of this application?

20              MS. SATINOVER:  Part 3?

21    Q.  Yes.  Thank you, Ms. Satinover.

22              Sir, under item 2, date of initial entry into the

23    United States you put October 19th, 2000.

24    A.  Oh, these are typos.

25    Q.  Ms. Satinover, can we turn to page 6 of the application?

H525ngo2                                    Ngono - cross

1              Again, you entered the country on December 7th, 2006?

2    A.  December 7, 2006.

3    Q.  Okay.

4              Ms. Satinover, can we focus in on the education

5    information section?

6              No. 8, date of graduation, there is an indicator here

7    in the parentheses about GED certificate --

8              THE COURT:  Slow down.

9    Q.  I'm sorry.

10             There is a indicator here of GED certificate?

11   A.  Yes.

12   Q.  It says the day:  May 26, 2006?

13   A.  Yes.

14   Q.  Did you put that in the application?

15   A.  Yes, I did.

16   Q.  So you received a GED seven months before you arrived in

17   the United States?

18   A.  When I took the test at LaGuardia I was told that test was

19   required, if I was to become a manager and when I studied as I

20   was doing school, I was already in college, and I decided to

21   apply for my DACA.  That was a requirement for a GED, because I

22   took the test that has the equivalency, I asked when they

23   enroll me, was it, can they give me the transcript of this test

24   that I took.  They gave me the copy of what they enroll me in

25   and this is the date that I put regardless of what it was

1    because I was applying for DACA.  In my understanding, on this

2    date, that was the date that was on the GED.  I don't know what

3    is GED.  You don't have no GED in Africa.  I ask for the test

4    that I took to get access and that test was also called

5    equivalency -- equivalency education.  And I asked for a copy

6    of that to apply for my DACA because I passed that test and

7    they gave me a copy and I put it there that date that was the

8    copy.

9    Q.  Sir, turning to my question, this application that you

10   filed under penalty of perjury, you have put that you received

11   a GED nearly seven months before you actually arrived in the

12   United States, correct?

13   A.  I did not read penalty of perjury.  I only needed a copy of

14   whatever test that I was accepted.

15            THE COURT:  Okay.  Let's try this one more time.  It

16   requires a yes or a no.  Would you please repeat the question?

17            MR. LONGYEAR:  Yes, your Honor.

18   Q.  On this application for relief under DACA, which you signed

19   under penalty of perjury, in the item marked education

20   information you said that you received a GED nearly seven

21   months before you arrived in the United States, correct?

22   A.  Not correct.

23            THE COURT:  The document speaks for itself.

24            MR. LONGYEAR:  One moment, your Honor.

25            (Pause)

1   BY MR. LONGYEAR:

2   Q.   Mr. Ngono?

3   A.   Yes.

4   Q.   You testified on direct and were shown a document,

5   Defendant's Exhibit B, the bank statement for Luckendy Realty.

6   Do you remember that?

7   A.   Yes.

8   Q.   And that's the bank statement for part of the international

9   criminal organization, correct?

10  A.   I don't know.  I only showed it because you gave it to me.

11  Q.   And that's -- but that's the company that you testified

12  they're the ones who received the money based on your work --

13  A.   Yes.

14  Q.   Now, Mr. Ngono, you have testified on direct examination

15  that your name is really Luc Ndi; is that correct?

16  A.   Yes, it is.

17  Q.   Did you previously provide statements under oath about your

18  identity during a pretrial conference in this case?

19  A.   Yes, I did.

20  Q.   And the day you provided those statements you took an oath

21  to tell the truth, didn't you?

22  A.   Absolutely correct.  And I told my name was Luc Ndi, under

23  oath.

24  Q.   You understood, sir, that when you were administered the

25  oath that if you didn't tell the truth that you could be

H525ngo2                          Ngono - cross

1    subject to perjury charges; is that right?

2    A.  Absolutely correct.  I understood that.

3            MR. LONGYEAR:  Your Honor, I have handed up what's

4    been marked Government Exhibit 2000.

5    Q.  Mr. Ngono, can you take a look at this document?

6    A.  Yes.

7    Q.  Is Government Exhibit 2000, is that a verbatim transcript

8    of the statements given at that conference?

9    A.  December 16.  Is that the date?

10   Q.  December 16th, 2016; yes, sir.

11   A.  Yes.

12           MR. LONGYEAR:  Your Honor, the government offers

13   Government Exhibit 2000.

14           THE COURT:  Would you approach, please?

15           MR. LONGYEAR:  Yes, your Honor.

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              THE COURT:  Are you offering the entire document?

3              MR. LONGYEAR:  I am glad you called us over.

4              No, your Honor.  I will offer the document.  I'm not

5    going to publish it to the jury.  I think that the relevant

6    portions, I think we can redact out all the irrelevant portions

7    so that the only part that will be in evidence would be the

8    relevant portions that come in upon this examination.  So, no,

9    we would not observing it in its entirety.

10             MR. HOWARD:  The idea is we would not publish it to

11   the jury now, we would talk about it and prepare redaction for

12   the Court later to the extent that the jury requests it during

13   deliberations.

14             THE COURT:  So you will read it into the record?  How

15   are you planning to do this?

16             MR. LONGYEAR:  I guess that would be -- you were asked

17   this, you answered this.  I think that is probably the best way

18   to do it.

19             THE COURT:  And you can give the page number and the

20   lines.

21             MR. LONGYEAR:  I think that's right.

22             THE COURT:  And then after you do that, having read

23   it, then Mr. Spilke, on behalf of Mr. Ngono, can put other

24   things in from this record; however, you will not put in the

25   penalties, the counts, or anything else.  It is limited to

1    whether he said under oath, that his name was Ngono or not.

2    Anything else in here is not relevant.

3            MR. LONGYEAR:  I'm sorry.  Just so I can clarify that.

4    I can ask him about the oath he was administered?

5            THE COURT:  Yes.

6            MR. LONGYEAR:  I can read the oath?

7            THE COURT:  Yes.

8            MR. LONGYEAR:  Here it is the name and date of birth,

9    your Honor.

10           THE COURT:  I know.  I understand.

11           MR. LONGYEAR:  Yes.

12           THE COURT:  But what I am saying is I don't want to

13   open a door to get the statements of the maximum penalties --

14           MR. LONGYEAR:  Yes, yes, yes.

15           THE COURT:  -- things like that in.  The jury is not

16   supposed to know any of that.

17           MR. LONGYEAR:  Yes.

18           THE COURT:  All right.

19           MR. LONGYEAR:  It is going to be very limited to a

20   couple of pages of that transcript, your Honor.

21           THE COURT:  All right.

22           MR. LONGYEAR:  I believe it is basically pages 6,

23   probably 6 and parts of page 8.

24           THE COURT:  That's page 7.

25           MR. LONGYEAR:  The oath is administered on the bottom

H525ngo2                        Ngono - cross

1   of page 6 and page 7.

2              THE COURT:  Okay.  Okay.

3              MR. LONGYEAR:  I think that's it.

4              THE COURT:  All right.  Okay.

5              MR. LONGYEAR:  Thank you, your Honor.

6              MR. NGONO:  Your Honor?  I'm sorry, your Honor.  I

7   have an objection for the document to be offered as an exhibit.

8              THE COURT:  What is the objection?

9              MR. NGONO:  Because that document, I have a document

10  that I will also enter into evidence before this one because

11  this one is December.  The statements were made in December,

12  December '16, 2016, but when I came on March 7, 2016, I was

13  already under oath with Judge Castel and I was already under

14  oath and that was in, I believe, June.  When I told Judge

15  Castel my name is Luc Owono and my counsel at that time was

16  Martin -- Mr. Martin -- Martin also objected to Judge Castel.

17  And Judge Castel specifically asked him like do you want me to

18  put this man under oath without telling me his name?  And Judge

19  Castel asked me what is your name, sir, on December, and I told

20  Judge Castel that my name is Luc Ndi.  It is on the record.

21             THE COURT:  But it is not under oath, right?

22             MR. NGONO:  It is right there.  I have it right here.

23  In June.

24             MR. LONGYEAR:  Your Honor, I believe what Mr. Ngono is

25  referring to is my understanding at that conference -- I can't

1    remember the date off the top of my head.

2              MR. NGONO:  June, yes.

3              MR. LONGYEAR:  It was a conference -- a waiver of

4    indictment to proceed by information.  I think Judge Castel

5    wanted to engage in colloquy to make sure that Mr. Ngono was --

6    could waive that right, and my recollection is that Mr. Cohen

7    of the Federal Defenders objected, would not let his client

8    answer that question.  Obviously, in an identity theft

9    situation, that could be used against him.  And so, at that

10   point that is when Judge Castel instructed the government to

11   proceed by indictment because he would not let Mr. Ngono

12   waive -- he would not let him waive indictment if he would not

13   engage in the colloquy.

14             THE COURT:  Okay.  All right.  That's not going to

15   help.

16             First of all, it wasn't under oath.

17             MR. NGONO:  It was under oath, your Honor.

18             THE COURT:  So this will not -- that will not, if you

19   will pardon me, trump this which is under oath.  So, your

20   objection is overruled.

21             MR. SPILKE:  But it -- I think it is also improper

22   impeachment.  He didn't give him a chance to adopt or reject

23   the statement.  All he did was ask him did you say your name is

24   Luc Ndi and then said did you attend a conference and were you

25   placed under oath.

1          MR. NGONO:  Yes.

2          MR. SPILKE:  That's improper impeachment.  He has to

3     give him an opportunity to adopt or reject the statement.

4          THE COURT:  He can read what was said under oath and

5     then ask him if he said it or not.

6          MR. SPILKE:  Right.

7          MR. NGONO:  But I was compelled to do it.

8          MR. SPILKE:  But he can't offer it at this point.

9          MR. NGONO:  I was compelled to do it.

10          THE COURT:  Why not?

11          MR. SPILKE:  He can read it, but if he rejects it then

12     he can offer it.  Maybe I'm mistaken, but.

13          THE COURT:  So, okay then.  Let me get this straight.

14          So what we will do is you will have Mr. Longyear read,

15     were you put under oath -- and you can read that part -- and

16     then were you asked the following questions and did you give

17     the following answers?  Question, answer.  Did you say that?

18     Yes or no.

19          MR. LONGYEAR:  Okay.

20          MR. NGONO:  Your Honor, can we take -- I was under

21     oath and then I was compelled to give my name.  I'm having

22     trouble giving this name because they asked me how old are you

23     and I told him you can add the numbers, I told Judge Castel,

24     and Judge Castel said, okay, I cannot add the number.

25          THE COURT:  I'm not talking about that transcript.

1              MR. NGONO:  This one.

2              THE COURT:  Was there a problem with the numbers in

3    this one?

4              MR. NGONO:  Yes.

5              MR. LONGYEAR:  He was asked how old he was he was,

6    your Honor.

7              THE COURT:  What page?

8              MR. SPILKE:  Judge, if I might make a suggestion?

9    Maybe this is a good time to take a break.  It's noon.

10             MR. LONGYEAR:  Your Honor, this is the end of the

11   examination and then we will be sitting down.

12             THE COURT:  Okay.

13             MR. LONGYEAR:  It may be logical to finish.

14             MR. HOWARD:  On page 8.

15             MR. LONGYEAR:  Top of page 8, your Honor:  Will you

16   tell me your age and then he engaged in --

17             MR. NGONO:  I didn't know how old '72 was and I told

18   Judge Castel, you can add the numbers.  And he said, no, you

19   have to do it.  It took me so much time to even figure out.

20             MR. LONGYEAR:  We were provided the exact birth date.

21             THE COURT:  Yes, I see that.  You can ask him -- you

22   can note that he was put under oath.  You will acknowledge as

23   your --

24             MR. NGONO:  I was compelled to --

25             THE COURT:  No, no, not compelled.

H525ngo2                          Ngono - cross

1              MR. NGONO:  Yes, I was compelled, your Honor, because

2       the government, after I gave my name, my counsel came and told

3       me if -- because you have your daughter, if, remember --

4              THE COURT:  What does your daughter have to do with

5       it?

6              MR. NGONO:  No, because I wanted to go home and she

7       said if you just tell the Judge what they want to hear, they're

8       going to let you go.  I was compelled to give this name.  I

9       didn't even know what this name was and gave the Judge my name

10      Luc Ndi from the day we start and then the Judge said

11      Mr. Ngono, what is your name?

12             THE COURT:  No.  You will read this, you will answer

13      the questions.  If you deny it he is putting it in evidence.

14

15

16

17

18

19

20

21

22

23

24

25

1             (In open court)

2             THE COURT:  You may proceed, Mr. Longyear.

3             MR. LONGYEAR:  Thank you, your Honor.

4    BY MR. LONGYEAR:

5    Q.  Mr. Ngono, do you recall a pretrial conference that took

6    place on December 16th, 2016?

7    A.  No.  I was called on pretrial conference that was called on

8    June 2016 because --

9             THE COURT:  You will answer the question.  That

10   testimony is stricken.

11            Yes or no, were you at a pretrial conference on

12   December 16th, 2016?

13            THE WITNESS:  No.

14            THE COURT:  You weren't there?

15            THE WITNESS:  I weren't there on pretrial conference

16   that started when I was -- in June --

17            THE COURT:  Mr. Ngono.

18            THE WITNESS:  Yes, your Honor.

19            THE COURT:  You do not control what happens here.  You

20   answer the questions that are put to you.

21            THE WITNESS:  Yes, your Honor.

22            THE COURT:  You do not answer other things.

23            THE WITNESS:  But --

24            THE COURT:  Are you saying, now under oath, that you

25   were not at a pretrial conference on December 16th, 2016.

H525ngo2                          Ngono - cross

1                  THE WITNESS:  Because --

2                  THE COURT:  No, no.  Is that what you are saying?

3                  THE WITNESS:  No, your Honor.

4                  THE COURT:  Well, that is what you said.  Twice you

5       just said, no, I wasn't there.

6                  THE WITNESS:  Because the first --

7                  THE COURT:  No.

8                  Ladies and gentlemen, we should probably take a

9       luncheon break at this point.  As you know, please do not think

10      about or discuss the case.  Enjoy your lunch and please be back

11      at 1:15.

12                  (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H525ngo2                          Ngono - cross

1                    (Jury not present)

2                    THE COURT:  Please, be seated.

3                    Anything that you say, Mr. Ngono, that is not directly

4          responsive to the questions Mr. Longyear puts to you, I am

5          striking from the record so let's not waste your time, my time,

6          or the jury's time.  All right?  You understand, anything that

7          you say that is not yes or no --

8                    THE WITNESS:  Yes.

9                    THE COURT:   -- in answer to his questions that he is

10         about to put, will be stricken.

11                   THE WITNESS:  But, your Honor, there is a --

12                   THE COURT:  I said will be stricken.

13                   (Luncheon recess)

14                   (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H522ngo3

```
 1                A F T E R N O O N   S E S S I O N

 2                            1:20 p.m.

 3           (Jury not present)

 4           THE COURT:  Good afternoon.  Please be seated.

 5           Mr. Ngono, you can go sit beside Mr. Spilke.

 6           (Pause)

 7           THE COURT:  Mr. Ngono, I wanted to make sure that you

 8   understood that, after Mr. Longyear finishes cross-examining

 9   you, Mr. Spilke will have an opportunity to do redirect with

10   you, so that if you don't feel that you have had an opportunity

11   on cross to explain something, Mr. Spilke will give you that

12   opportunity on redirect.  All right?

13           MR. NGONO:  Yes, your Honor.

14           THE COURT:  The other thing is that I understand that

15   the government wishes to put in, if necessary, the transcript

16   of December 16, certain parts of it, for purposes of

17   identification, and no mistake, and also prior inconsistent

18   statement, and all sorts of things, but you are limiting it to

19   issues that are in this case that are at issue.

20           MR. LONGYEAR:  Correct, your Honor.

21           THE COURT:  Mr. Ngono, is there any other sworn

22   testimony in any of the appearances before either Judge Castel

23   or before me where, under oath, you say that your name is Luc

24   Ndi?

25           MR. NGONO:  Yes, your Honor.
```

H522ngo3

1        THE COURT:  Can you cite that for me?

2        MR. NGONO:  Your Honor, even based on the government

3  document on page 10, I have specifically told Judge Castel

4  that, You are asking me these questions because it would be

5  prejudicial.  So by me stating my name --

6        THE COURT:  What --

7        MR. NGONO:  Page 10.

8        THE COURT:  Of December 16?

9        MR. NGONO:  Yes, your Honor.  I raise this issue, page

10  10, the first paragraph.

11        MR. LONGYEAR:  It begins at the bottom of page 9, your

12  Honor.

13        (Pause)

14        THE COURT:  Now, you didn't say that your name was Luc

15  Ndi under oath here.  You objected to having to give the

16  information that you had already given.

17        MR. NGONO:  Yes, your Honor.

18        THE COURT:  So that doesn't count.  What I am asking,

19  is there, under oath, another time where you said that your

20  name was Luc Ndi?

21        MR. NGONO:  Yes, your Honor.

22        THE COURT:  Mr. Spilke?

23        MR. SPILKE:  Yes, Judge.

24        THE COURT:  There is?

25        MR. SPILKE:  I am not sure if it was under oath, but

H522ngo3

1    what Mr. Longyear relayed to the court about the appearance at

2    which a superseding information was about to be entered, I

3    understand that at that date he did say his name was Luc Ndi.

4    I don't know if he was under oath though.

5              MR. LONGYEAR:  Your Honor, this was the May -- I don't

6    know the specific date, but it was the May 16, 2016,

7    conference.  Ms. Satinover is going to get the transcript, your

8    Honor.

9              Mr. Ngono was placed under oath.  He was asked his

10   name.  He said Luc Ndi.  He was asked his age; provided an age.

11   At which point Mr. Cohen, of Federal Defenders, asked Judge

12   Castel to stop the inquiry because it -- answers in an identity

13   theft could prejudice the defendant.  And at that point, after

14   more back-and-forth with the defendant, he said, If I can't

15   engage in an inquiry here, if Mr. Ngono could make a voluntary

16   waiver.  He then instructed the government to proceed by

17   indictment.

18             I can bring up the transcript your Honor.

19             THE COURT:  No.  I believe you.  What I am saying is

20   that that was under oath that he said his name was Luc Ndi.

21             MR. NGONO:  Yes, your Honor.

22             THE COURT:  All right.  Then on redirect, Mr. Spilke

23   may have an opportunity to question you about that.

24             MR. NGONO:  Yes, your Honor.

25             THE COURT:  All right?

H522ngo3

| | |
|---|---|
| 1 | MR. NGONO:  Yes, your Honor. |
| 2 | THE COURT:  Now, you received the draft jury charge |
| 3 | this morning.  Have you considered how much time you will need |
| 4 | to read it and be ready to have a charging conference? |
| 5 | MR. NGONO:  About one day. |
| 6 | THE COURT:  One day? |
| 7 | MR. NGONO:  Yes, your Honor. |
| 8 | THE COURT:  So tomorrow? |
| 9 | MR. NGONO:  Yes, your Honor. |
| 10 | THE COURT:  All right.  What I am thinking of doing, |
| 11 | and I want to let counsel know, is when we finish up today, I |
| 12 | am going to ask the marshals if they would be so kind as to let |
| 13 | Mr. Ngono and Mr. Spilke stay here in order to start going over |
| 14 | it, then I will ask to have Mr. Ngono produced at 9 a.m. |
| 15 | tomorrow morning so that he can continue going over it with |
| 16 | Mr. Spilke.  Then we will start a charging conference perhaps |
| 17 | 11:30.  We will then have the jury return Thursday morning at |
| 18 | 9:30.  That should give Mr. Ngono sufficient time to be |
| 19 | prepared for the charging conference tomorrow late morning and |
| 20 | to have Mr. Spilke available to him from this afternoon and |
| 21 | also early tomorrow morning so that we are fully ready to go. |
| 22 | All right? |
| 23 | MR. NGONO:  Yes, your Honor. |
| 24 | THE COURT:  So I am going to tell the jury when we |
| 25 | adjourn for the day that they should return at 9:30 a.m. on |

H522ngo3                     Ngono - Cross

1    Thursday morning, and I will also tell them that they will be

2    deliberating, so that they have to be in on Friday.

3              Anything else?

4              MR. SPILKE:  Judge, as far as -- so because Mr. Ngono

5    is on cross-examination, we haven't conferred about a possible

6    redirect examination.  Once Mr. Longyear is finished -- and I

7    believe it is going to be relatively quickly -- I would like an

8    opportunity to be able to confer with Mr. Ngono about the

9    redirect.

10             THE COURT:  No, no, I can appreciate that.  How much

11   time would you need?

12             Mr. Ngono, how much time would you need to consult

13   with Mr. Spilke about your redirect?

14             MR. NGONO:  Ten minute.

15             THE COURT:  All right.  Then what we will do is bring

16   the jury out, the government will complete its

17   cross-examination, we will send them back in, and give

18   Mr. Spilke and Mr. Ngono time to get their redirect in order,

19   then we will bring them out again.  All right?

20             MR. SPILKE:  Thank you, your Honor.

21             MR. LONGYEAR:  Thank you, your Honor.

22             THE COURT:  Mr. Ngono, would you resume the stand.

23             MR. NGONO:  Yes, your Honor.

24             (Continued on next page)

25

H522ngo3                          Ngono - Cross

1          (Jury present)

2          THE COURT:  Good afternoon, ladies and gentlemen.

3          JURORS:  Good afternoon.

4          THE COURT:  Please be seated.

5          Mr. Longyear.

6          MR. LONGYEAR:  Thank you, your Honor.

7   BY MR. LONGYEAR:

8   Q.  Mr. Ngono, before the break, we were discussing a pretrial

9   conference that took place on December 16, 2016.

10          Do you remember that, sir?

11  A.  Yes, sir.

12  Q.  Do you remember that conference taking place on December

13  16, 2016?

14  A.  Yes, I do.

15  Q.  Do you remember at that conference that you were placed

16  under oath?

17  A.  Yes.

18  Q.  Do you recall that the deputy clerk administered the oath

19  as follows:  "Do you solemnly swear or affirm that the

20  testimony you are about to give in this proceeding, will be the

21  truth, the whole truth, and nothing but the truth?"

22  A.  Yes.

23  Q.  And you recall answering "yes"?

24  A.  Yes.

25  Q.  Do you then recall the court asking you to state your full

1   name for the record?

2   A.  No.

3          MR. LONGYEAR:  Your Honor, just for identification

4   purposes, I am reading from what's been marked for

5   identification as Government Exhibit 2000, page 7/line 11:

6          "The Court:  Now, Mr. Ngono, please state your full

7   name for the record."

8   Q.  Do you recall being asked that, sir?

9   A.  I recall being called, Mr. Ngono, please tell your full

10  name as Mr. Ngono.

11  Q.  Sir, do you recall the question being put to you by the

12  court as, "Now, Mr. Ngono, please state your full name for the

13  record?"

14  A.  Yes, I recall the court calling me, Mr. Ngono, please state

15  your name as Mr. Ngono.

16         THE COURT:  Excuse me.  All right.  Go on.

17  Q.  Do you recall --

18         MR. LONGYEAR:  Your Honor, can we?

19         THE COURT:  Sure.

20         MR. LONGYEAR:  Thank you.

21         (Continued on next page)

22

23

24

25

H522ngo3                          Ngono – Cross

1              (At the sidebar)

2              THE COURT:  You are distorting the question that the

3    court asked you.  It is written down, and he didn't ask you to

4    state your name as Mr. Ngono.

5              MR. NGONO:  Yes, your Honor.

6              THE COURT:  So why are you saying this under oath now

7    in front of this jury?

8              MR. NGONO:  Because I was called Mr. Ngono, please

9    state your name.

10             THE COURT:  "for the record."  Not "as Mr. Ngono."

11             Do you understand that the jury is hearing you say

12   these things?

13             MR. NGONO:  Yes, your Honor.

14             THE COURT:  That you are under oath now?

15             MR. NGONO:  Yes, your Honor.

16             THE COURT:  I want you to be very careful about the

17   answers that you give because you do not want to lose

18   credibility in front of the jury.

19             MR. NGONO:  Yes, your Honor.

20             THE COURT:  All right.

21             MR. NGONO:  Yes, your Honor.

22             (Continued on next page)

23

24

25

H522ngo3

1                    (In open court)

2                    THE COURT:  Would you repeat the question, please,

3     Mr. Longyear?

4                    MR. LONGYEAR:  Thank you, your Honor.

5     BY MR. LONGYEAR:

6     Q.  Mr. Ngono, do you recall being asked by the court:  "Now,

7     Mr. Ngono, please state your full name for the record?"

8     A.  Yes.

9     Q.  And do you recall giving the answer "Ngono, André"?

10    A.  Yes.

11    Q.  And then do you recall the court asking you, "Do you have a

12    middle name?"

13    A.  Yes.

14    Q.  And you gave the answer "Marie."

15    A.  Yes.

16    Q.  Mr. Ngono, do you also recall being asked under oath by the

17    court, this is on page 8 of what's been marked as Government

18    Exhibit 2000, "And what's your date of birth?"

19    A.  Yes.

20    Q.  And do you recall giving the answer "March 24, 1972"?

21    A.  Yes.

22                   MR. LONGYEAR:  One moment, your Honor.

23                   (Counsel confer)

24                   MR. LONGYEAR:  No further questions, your Honor.

25                   THE COURT:  Thank you.

H522ngo3

1            Ladies and gentlemen, I know we just brought you out,

2     but before we continue, we need to take another brief recess.

3            As you know, please do not think about or discuss the

4     case, and we will come and get you in about 15 minutes.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H522ngo3

1          (Jury not present)

2          THE COURT:  Mr. Ngono, you may step down.

3          Is there some way that we can give Mr. Spilke and

4    Mr. Ngono a little room so that they can confer?  Maybe you

5    guys would like to step out into the hall or talk to some of

6    your colleagues or something like that.

7          MR. LONGYEAR:  What time would you like us back, your

8    Honor?

9          THE COURT:  I think about 15 minutes.

10         MR. LONGYEAR:  Very good.  Thank you, your Honor.

11         (Recess)

12         (Jury not present)

13         THE COURT:  Are we ready for the jury?

14         MR. SPILKE:  Yes, Judge.

15         just For the record, Mr. Ngono and I have conferred

16   for the last ten minutes and Mr. Ngono has given me questions

17   that he would like me to put to him on redirect.

18         THE COURT:  Thank you.

19         (Continued on next page)

20

21

22

23

24

25

H522ngo3                           Ngono – Redirect

 1              (Jury present)

 2              THE COURT:  Please be seated, ladies and gentlemen.

 3              Mr. Spilke.

 4              MR. SPILKE:  Yes, your Honor.

 5    REDIRECT EXAMINATION

 6    QUESTIONS FROM MR. NGONO BY MR. SPILKE:

 7    Q.  Sir, do you remember being asked on cross-examination

 8    whether you provided fingerprints to Pentagon?

 9    A.  Yes, I remember.

10    Q.  You stated that you did not provide fingerprints to

11    Pentagon, right?

12    A.  No, I did not provide fingerprint to Pentagon.

13    Q.  Do you wish to explain?

14    A.  I provided fingerprint to Luckendy Realty, which was

15    properly responsible to that real estate company that was to

16    place me to work for them at Pentagon, and they signed that

17    fingerprint card and pass it to Pentagon.

18    Q.  Do you recall being shown in Exhibit 401, Government

19    Exhibit 401 in evidence, on cross-examination, what purported

20    to show a credit card payment for a CUNY application?

21    A.  I recall the exhibit.

22    Q.  And you stated that you did not pay for the CUNY

23    application?

24    A.  No, I did not.

25    Q.  Would you like to explain?

H522ngo3                        Ngono - Redirect

```
 1   A.   Yes.  Anything related to payment, application online,
 2   payment, tuition, and all that, I was not involved into any
 3   paperwork or any application.  All I did was study to become
 4   manager.
 5   Q.   And you were asked a series of questions about statements
 6   you made under oath at a conference on December 16, 2016.
 7          Do you recall that?
 8   A.   Yes, I do.
 9   Q.   You don't deny that you gave the name André Marie Ngono
10   under oath, right?
11   A.   No.
12   Q.   And you don't deny that you gave the birthday in 1972,
13   right?
14   A.   No.
15   Q.   Did you also object yourself personally to stating your
16   identity and answering questions based on your identity?
17   A.   Yes.  I personally objected to stating my identity.
18          MR. LONGYEAR:  Objection.
19          THE COURT:  Sustained.
20   BY MR. NGONO:
21   Q.   At a previous conference, you were also placed under oath,
22   right?
23   A.   Yes.
24   Q.   And you were asked your name, right?
25   A.   Yes, I was.
```

792

H522ngo3

1    Q.   And you gave your age, right?

2    A.   Yes.

3    Q.   And what date was that conference, approximately, if you

4    can?

5    A.   That date, approximately May, June 2016.

6    Q.   What name did you give?

7    A.   What I tell you, I gave the name, my name, Luc Ndi, to the

8    judge under oath.

9    Q.   And what age did you give?

10   A.   At that time I was 29.

11              MR. SPILKE:  Nothing further, your Honor.

12              MR. LONGYEAR:  No questions on recross.

13              THE COURT:  Mr. Ngono, you may step down.

14        Mr. Ngono, do you have any further evidence to present

15   to the jury.

16              MR. NGONO:  Yes, I would like to introduce the

17   transcript of May 2016 where I stated my name under oath.

18              THE COURT:  Come up here.

19              (Continued on next page)

20

21

22

23

24

25

H522ngo3

1                    (At the sidebar)

2              THE COURT:  You testified here under oath about what

3    you said in May of 2016 under oath.

4              MR. NGONO:  Yes, your Honor.

5              THE COURT:  There is no reason for that transcript to

6    come in.  So I will deny your request to admit that into

7    evidence.

8              Anything else that you have to present to this jury at

9    this time?

10             MR. NGONO:  No, your Honor.

11             THE COURT:  Then when you go back to your seat, say

12   "the defense rests," okay?

13             MR. NGONO:  Yes, your Honor.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H522ngo3

```
 1              (In open court)

 2              MR. NGONO:  Your Honor, at this time the defense

 3    rests.

 4              THE COURT:  Thank you, Mr. Ngono.

 5              Anything further from the government?

 6              MR. LONGYEAR:  No, your Honor.

 7              THE COURT:  Thank you.

 8              Ladies and gentlemen, we have completed the

 9    presentation of evidence.  But your work is just beginning.  We

10    need to have summations, arguments from the parties, and my

11    instructions on the law.  In order for that to go smoothly, we

12    are not sitting tomorrow, Wednesday.  You should be back in the

13    jury room at 9:30 Thursday morning.  And this Friday the jury

14    will be deliberating, so you have to come in on Friday as well.

15              So we are adjourning for the day.  Have a pleasant

16    evening, have a great day tomorrow, and we will see you back

17    9:30 a.m. on Thursday.

18              (Continued on next page)

19

20

21

22

23

24

25
```

H522ngo3

1            (Jury not present)

2            THE COURT:  Please be seated.

3            We have a note from the jury, Court Exhibit 2.  I will

4     read it to you in one minute.

5            (Pause).

6            THE COURT:  The jury asks:  "Should alternates come

7     Friday?"

8            I am going to write back that:  "Alternates must be

9     here until discharged by the court."

10           (Pause)

11           THE COURT:  Ms. Williams, will you take this in to the

12    jury room?

13           THE DEPUTY CLERK:  Yes, Judge.

14           THE COURT:  Mr. Ngono, you have quite a few things

15    ahead of you.  I want to tell you that, in addition to

16    reviewing the jury charge with Mr. Spilke, you should also be

17    preparing your summation argument.  Because at 9:30 on

18    Thursday, the government is making an argument, then you have

19    an opportunity to make an argument, and then the government has

20    what is called a rebuttal argument.

21           After that, I will charge the jury.

22           So once we take care of firming up the jury charge

23    tomorrow, after the charging conference, we should all be ready

24    to go.

25           MR. NGONO:  Yes, your Honor.

1          THE COURT:  Anything else that we need to deal with

2     this afternoon?

3          MR. LONGYEAR:  Your Honor, just in terms of the

4     charge, so tomorrow morning at 11:30 will we then get a new

5     draft of the charge?

6          THE COURT:  How many times do you think I'm going to

7     type this thing?

8          MR. LONGYEAR:  No.  I'm just --

9          THE COURT:  No, because whatever markings you put on

10    that one, I don't want you to have to transfer to a new one.

11    So we are getting one of those all-in-one, everybody's

12    comments, everything, which is why we are going to need time to

13    get it into shape.  So you are not going to get another draft.

14    And, besides, this is the only draft that Mr. Ngono has to be

15    prepared for the charging conference tomorrow.  Don't make work

16    for yourself.

17         MR. LONGYEAR:  No.  Absolutely not, your Honor.  I

18    just was clarifying.

19         Thank you, your Honor.

20         THE COURT:  Anything else?

21         MR. SPILKE:  I would like leave of the court to be

22    able to use the courtroom for the next little bit to go over

23    the charge with Mr. Ngono?  I have conferred with the marshals,

24    and they have agreed to stay for a little bit longer or as long

25    as we need, actually, and with my gratitude, our gratitude.

H522ngo3

1           THE COURT:  And with the gratitude of the court.  Yes,

2     of course you may use the courtroom.

3           MR. SPILKE:  Thank you, and thanks to the marshals.

4           THE COURT:  See you tomorrow.

5           MR. LONGYEAR:  Thank you, your Honor.

6           (Pause)

7           THE COURT:  Counsel, I just want to make sure that,

8     even though everyone is getting together at 11:30, I want

9     Mr. Ngono here at 9 a.m. so that he can continue going over the

10    charge with Mr. Spilke and/or working on his summation.  I just

11    wanted to make sure.  Thank you very much.

12          MR. SPILKE:  Yes, Judge.

13          MR. LONGYEAR:   Thank you, your Honor.

14          (Adjourned to Wednesday, May 3, 2017, at 11:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
INDEX OF EXAMINATION

Examination of:                              Page


ANDRÉ MARIE NGONO

Questions from Mr. Ngono by Mr. Spilke . . . . 701

Cross By Mr. Longyear  . . . . . . . . . . . 747

Questions from Mr. Ngono by Mr. Spilke   . . . 790




                 DEFENDANT EXHIBITS

Exhibit No.                              Received

 K and L   . . . . . . . . . . . . . . . . 739
```